# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

===============
## NO. 03-99-00827-CR
===============

**Roger Lerma, Appellant**

**v.**

**The State of Texas, Appellee**

===========================================================================
### FROM THE DISTRICT COURT OF CALDWELL COUNTY, 274TH JUDICIAL DISTRICT
### NO. 98-202, HONORABLE CHARLES R. RAMSAY, JUDGE PRESIDING
===========================================================================

Appellant Roger Lerma appeals three convictions—for murder and two counts of aggravated assault. *See* Tex. Penal Code Ann. §§ 19.02(b)(1), (2), 22.02 (West 1994). After finding appellant guilty of the three offenses, the jury assessed punishment for murder at twenty-five years' imprisonment and at twenty years' imprisonment for each of the aggravated assault offenses.

## Points of Error

Appellant advances five points of error. In the first three points, appellant asserts that the evidence was "legally insufficient" to support the three convictions. In the fourth point of error, appellant claims that the implied jury's finding at the penalty stage of the trial that the murder was not committed under the immediate influence of sudden passion arising from an adequate cause was "against the preponderance of the evidence." In his fifth point, appellant urges that he was denied his federal and state constitutional right to effective assistance of counsel. We will affirm.

**Facts**

Three of the five points of error relate to the sufficiency of the evidence; therefore, the facts are important. The single indictment in separate counts charged appellant with the murder of Henry Silva and aggravated assaults upon Ronnie Valdez and Chris Baltierra. The offenses grew out of a confrontation between the LRN and KMM gangs or groups[1] on China Street in Lockhart about 10:30 p.m. on February 20, 1998.

Richard Lozano, a deputy sheriff, was off-duty at his home on the night in question, when he heard five continuous gunshots. Lozano drove to the scene about a block from his home. He found Henry Silva lying in the street in obvious pain calling for his mother. Lozano observed an indentation in Silva's back.

James Beck, a Lockhart City Police Officer, was the first on-duty peace officer on the scene. He found the wounded Silva lying in the street. Silva told Beck that he (Silva) did not know who shot him. An ambulance was called, but Silva died on the way to an Austin hospital. Beck did not see appellant at the scene. Beck did observe the aggravated assault complainants, Ronnie Valdez and Chris Baltierra. In Officer Beck's opinion, they both were intoxicated.

Dr. Elizabeth Peacock, deputy medical examiner for Travis County, performed the autopsy on the twenty-year-old Henry Silva, who weighed 222 pounds and was five feet and seven inches tall. Dr. Peacock found that the cause of death was a gunshot wound to the left lower

---

[1] The record reflects that "LRN" means "La Rosa Negra" (Black Rose) and that "KMM" means "Krazy (dirty word) Mescanes." The term "gang" as used herein is given its common usage, not necessarily the statutory meaning of "a criminal street gang." *See* Tex. Penal Code Ann. § 71.01(d) (West Supp. 2001).

abdomen, which caused extensive hemorrhaging. A large caliber bullet that was severely flattened on one side was removed from Silva's body. Dr. Peacock explained that the bullet had gotten its shape from an outside source before entering Silva's body. No bones were involved in the injury. There was no gunshot residue around the wound. Silva's blood alcohol was shown to be 0.06 percent.

Russell Johnson, a Texas Department of Public Safety firearms examiner, identified the bullet removed from Silva's body as a .45 caliber bullet. He testified that if the bullet did not hit Silva's bones, it could have ricocheted or bounced off a street, a brick, an object, "or something" before it entered Silva's body.

Turning to the other circumstances surrounding the shooting, we observe that the witnesses for the prosecution include members or associates from both the LRN and KMM groups. Nine witnesses placed appellant at the scene of the shooting. Other evidence showed that the .45 caliber pistol which fired the fatal shot was appellant's, and was in his possession that night. Appellant claimed alibi and offered evidence that he was in San Marcos on the night of February 20.

On the night in question, the KMM group drove by Carlos Cantu's apartment on China Street several times. There was an exchange of words and possible bottle throwing between the KMM group and the LRN group at Cantu's apartment. On the third drive-by, at least three vehicles of the KMM group or associates stopped near the Cantu apartment. Henry Silva, the deceased, Ronnie Valdez, and Chris Baltierra got out of the vehicles and approached the LRN group standing outside the Cantu apartment.

3

Cantu testified for the prosecution.[2] He stated that "after work" on February 20, 1998, appellant, Frank Tello, Roy Cortez, Angel Gomez, and others were at his apartment. Later, Cantu left to visit a friend in an Austin hospital. Within a matter of minutes after his return home, a number of cars stopped. There were people in the street yelling, and throwing rocks and bottles. Cantu armed himself with a .38 caliber "special derringer." Tello pulled a .38 caliber weapon from his pants. Cantu reported that appellant displayed appellant's .45 caliber pistol with a gold trigger. He identified that pistol as State's exhibit no. 5A, as did Mary Rivera, Tello's girlfriend, and Gomez, who were present at the time. Gomez testified that appellant stated that he wanted "to go down the block and start stuff." According to Gomez, Cantu cautioned against the move, but when appellant left the house the others followed.

Cantu stated that he and Tello exited the house and ran to the left to a position behind a tree. Appellant, dressed in black clothing with a hood, ran across the street where a church was located. Gomez ran out in the street towards the other group. Cantu ducked when a bottle was thrown. He then heard a shot. He did not know where it came from. Cantu then fired his weapon twice in the air, as did Tello. Cantu claimed his acts were in self-defense. About this time Cantu heard five or more shots fired from the church-side of the street where appellant had been standing. It was dark. Cantu saw a dark figure there, but he could not see the figure's face.

Cantu's gun was empty so he ran into his apartment. Cantu then observed appellant, Rivera, and Gomez get into Santos Gonzales's car and leave the scene. Cantu left his apartment via

---

[2] Cantu denied being a member of the La Rosa Negra gang. Other evidence contradicted that denial.

4

the back door, threw his gun away, and went to the backyard of his girlfriend's house where he spent the night.

Rivera testified that she was at the front door of the Cantu apartment when Cantu and Tello fired shots. She heard other shots, but in the darkness could not see the face of the person across the street where the other shots originated. Rivera had earlier placed appellant in that location. After the shooting ended, Rivera revealed that she, Tello, appellant, and Mateo Pastrano "took off" in Gonzales's car; the car turned onto Blanco Street; and that she and Tello got out of the car after it had traveled several blocks.

Gomez admitted that he, appellant, Cantu, and Tello were all members of the La Rosa Negra gang. Gomez testified that when the KMM gang arrived on the scene in several vehicles, he left the Cantu apartment when appellant did. Although he was unarmed, Gomez ran out into the street "in front of Ronnie Valdez and all of them" and told "them to get the heck out of there." The KMM group threw bottles at him, but Gomez did not see any guns or hear any shots fired by the KMM group, including the deceased Silva.[3] Gomez ran to the curb and tripped as he heard shots behind him from the church-side of the street. Gomez hid behind a tree. He saw the "whole crowd," including appellant, getting into Gonzales's car. Gomez left the scene on foot before Gonzales's car departed.

---

[3] This latter testimony is consistent with other evidence in the record from the LRN group members who were witnesses. The KMM witnesses for the prosecution testified that they were unarmed and did not fire any shots. Officer Beck searched Valdez, Baltierra, and other KMM group members at the scene and found no weapons. A search of the area revealed no guns.

5

Gomez reported that over a year later, appellant threatened him and told him that the LRN gang would take care of Gomez, apparently because of his expected testimony. Cantu testified that the day after the shooting appellant asked Cantu to lie and say that appellant was in San Marcos on the night that Silva was killed. Cantu agreed at the time, but testified that he had no intention of lying about appellant's alibi.

Other State's witnesses were KMM gang members, associates, or friends. Their testimony reveals that three vehicles drove past Cantu's apartment and stopped on the night in question. Joe Amaya was driving his pickup truck and was accompanied by Henry Silva, Chris Baltierra, Armando Rodriguez, and Jason Rodriguez. Valdez was in a car being driven by Yvette Mojica. Rocky Nino, Randon Romera, and Mojica's "little boy" were also in that vehicle. The third car was driven by Jerry Silva, Henry's cousin, who was accompanied by two teen-age girls, Missy Delgado and Hortencia Rodriguez.

Joe Amaya admitted that he had driven past the Cantu apartment on the night in question "quite a few times." He contended it was his "normal path" and his group was not looking for trouble. Armando Rodriguez, fourteen years of age, was with Amaya. Armando claimed that on their first trip past Cantu's apartment, Cantu's group yelled "faggots" at them. On the second pass, Armando acknowledged that his group "talked back." He saw Cantu with a gun and saw Cisco Garcia get a gun. Thereafter, Armando stated that Amaya and his passengers encountered Ronnie Valdez, who advised them to go to Baltierra's grandmother's house. However, on the third pass, Amaya's truck stopped. Armando heard appellant, Cantu, and others talking "lip," heard shots, saw Henry Silva go down, and observed appellant leave the scene in Gonzales's car.

6

Jason Rodriguez, Armando's sixteen-year-old cousin, confirmed much of Armando's testimony. Jason summed up the matter well. When asked what happened on the third pass by Cantu's apartment, he replied: "We got off to fight and my friend got shot."

Joe Amaya reported that his group encountered Valdez on Pecos Street; that Henry Silva and Valdez talked; that he then drove to China Street and parked; that Henry Silva got out of the vehicle; that the "two groups came towards each other;" and that Ronnie Valdez, Chris Baltierra, and Henry Silva were in the street. Amaya heard shots but he did not see who was shooting.

Chris Baltierra testified that he had been convicted of a felony offense—retaliation against a peace officer, which occurred in May 1998 after the shooting in the instant case. Baltierra was granted probation and was confined at the Uvalde Substance Abuse Rehabilitation Facility at the time of this trial. He arrived on the scene on China Street on February 20, 1998, with Amaya. The Cantu group was yelling words which were "words to fight." Baltierra threw a can at the other group. He was in the middle of the street with Silva when he heard five to eight shots. Some of the shots came from Cantu's yard and others came from the church side of the street. Baltierra saw one shot from the church side hit the street and "bounce off something." He heard Henry Silva yelling that he had been shot. Baltierra stayed with Silva until the ambulance came. Baltierra could not identify the figure he saw near the church but he placed appellant at the scene.

At the time of the September 1999 trial, Valdez had been convicted of possession of cocaine, and was confined in the Brownwood Substance Abuse Facility. Valdez testified that he arrived on the scene on the night in question in Mojica's car, which had first stopped behind Amaya's truck. Valdez got out of the car and joined in the yelling of "lip" and "trash" between the two

7

groups. He yelled and asked if the other group wanted to "fight like men." Valdez acknowledged that Henry Silva and Joe Amaya were fist fighters, often prone to get into fights. He denied that any of them had guns. Henry Silva and Baltierra joined Valdez in yelling at the other group. Valdez saw Cantu in front of his apartment, Gomez in the middle of the street, and appellant on the church-side of the street. Valdez heard five or six shots coming from the Cantu apartment area. These shots went up in the air and hit the street and curb. Valdez also saw other bullets "skipping" on the street towards him where he was standing with Baltierra and Henry Silva. When the shooting stopped, Valdez got into Mojica's car. He then heard Henry Silva yelling that he had been shot and asking for his mother. When Mojica left to get Silva's mother, Valdez stayed with Silva until the ambulance arrived.

Yvette Mojica's testimony, with few exceptions, dovetailed into Valdez's testimony. Rocky Nino, 17 years old at the time, was in the back seat of Mojica's car. He heard four or five shots. Nino saw a lone individual near the curb by the church with a weapon which looked like State's exhibit no. 5A. He saw a bullet hit the street and bounce off just before Henry Silva cried out that he was shot. Nino thought the bullet had hit Mojica's car. He could not see the face of the shooter by the church.

Jerry Silva, Missy Delgado, and Hortencia Rodriguez all related that they had been driving around for thirty minutes, and turned onto China Street for the first time, spotted Amaya's truck, and pulled in behind Mojica's vehicle. They had not earlier encountered Valdez or Amaya. After the first shots were fired from the driveway of Cantu's apartment, Jerry Silva drove his vehicle into a nearby dead-end street. He was later told that his cousin, Henry, had been shot, and he

8

returned to the scene. Hortencia confirmed much of Jerry Silva's testimony. She and Delgado both placed appellant at the scene near the church across from the Cantu apartment.

Richard Giberson of Buda owned the rental house at 1107 North Blanco in Lockhart. This property is located at the rear of the Cantu apartment and is just around the corner from the area on China Street where the shooting took place. On February 21, 1998, Giberson was inspecting his property when in the front yard he found a .45 caliber pistol with a yellow or gold trigger and a clip. Believing that his last renter, who had vacated the premises without paying the rent, had left the weapon behind, Giberson took the pistol and clip home to Buda. Later, learning that a weapon of this nature was being sought in Lockhart in connection with a murder, Giberson contacted Hays County authorities, who returned the pistol and clip to the authorities in Lockhart. Giberson identified the pistol as State's exhibit no. 5A.

Russell Johnson, the firearms examiner, testified the bullet removed from Henry Silva's body had been fired from State's exhibit No. 5A, a .45 caliber pistol with gold trigger, submitted to him by the Lockhart authorities. He determined that two .45 caliber shell casings found on February 21 and March 13, 1999, near the curb by the church on China Street had also been fired by State's exhibit no. 5A. Johnson, however, could not connect these casings with the fatal bullet although all were fired by the same weapon. No identifiable fingerprints were found on any of the submitted items, including the two .38 caliber casings found by Officer Beck or the .38 caliber weapon turned in by Frank Tello.

Appellant did not testify but offered evidence that he was not in Lockhart on the fateful night. Christina Morales was in the Central Texas Medical Center in San Marcos from January

9

30 to February 26, 1998, due to high blood pressure resulting from her pregnancy with appellant's child. Jamie Mott, the attending nurse, knew appellant as a regular visitor and one who stayed past the night visiting hours at the hospital. On February 20, 1998, at 6:30 p.m., Mott made an entry in the hospital records that appellant was in Morales's room. Dee Lucia, formerly married to appellant's uncle, testified that because appellant had no car, she often picked him up at the hospital and let him stay at her home in San Marcos. Lucia testified that on February 20, 1998, she picked up appellant at the hospital and took him to her home to eat dinner about 7:30 to 8:00 p.m. She recalled that he showered and retired about 9:00 p.m. Appellant was asleep when Lucia checked on him between midnight and 1:00 a.m. on February 21, and was there the next morning when she awakened.

Christina Morales testified that appellant was a frequent visitor at the hospital and often stayed until 10:00 p.m. in the evening. She testified that appellant was with her on the night of February 20, 1998 until 10:00 p.m., which was the normal time for his aunt to pick him up.

The jury rejected the defensive theory and found appellant guilty of murder and the two aggravated assaults as alleged.

### Legal Sufficiency—Murder Conviction

In his first point of error, appellant urges that the "evidence presented at trial was legally insufficient to support the conviction for murder as alleged in count one of the indictments." Thus, by his expressed contention, appellant challenges only the legal sufficiency of the evidence. On appeal, a convicted defendant may question the sufficiency of the evidence even though that issue was not raised in the trial court. *Flanary v. State*, 316 S.W.2d 897, 898 (Tex. Crim. App. 1958) (op. on reh'g); *Givens v. State*, 26 S.W.3d 739, 740-41 (Tex. App.—Austin 2000, pet. filed).

10

## The Standard of Review

The standard for reviewing the legal sufficiency of evidence is whether, viewing the evidence in the light most favorable to the jury's verdict, any rational trier of fact could have found beyond a reasonable doubt all the essential elements of the offense charged. *Jackson v. Virginia*, 443 U.S. 307, 319, (1979); *Skillern v. State*, 890 S.W.2d 849, 879 (Tex. App.—Austin 1994, pet. ref'd). The standard of review is the same in both direct and circumstantial evidence cases. *King v. State*, 895 S.W.2d 701, 703 (Tex. Crim. App. 1995); *Green v. State*, 840 S.W.2d 394, 401 (Tex. Crim. App. 1992). The State may prove its case by circumstantial evidence if it proves all of the elements of the charged offense beyond a reasonable doubt. *Easley v. State*, 986 S.W.2d 264, 271 (Tex. App.—San Antonio 1998, no pet.) (citing *Jackson*, 443 U.S. at 319). The sufficiency of the evidence is determined from the cumulative effect of all the evidence; each fact in isolation need not establish the guilt of the accused. *Alexander v. State*, 740 S.W.2d 749, 758 (Tex. Crim. App. 1987). It is important to remember that all the evidence the jury was permitted, properly or improperly, to consider must be taken into account in determining the legal sufficiency of the evidence. *Garcia v. State*, 919 S.W.2d 370, 378 (Tex. Crim. App. 1994); *Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993); *Rodriguez v. State*, 939 S.W.2d 211, 218 (Tex. App.—Austin 1997, no pet.).

The jury is the exclusive judge of the facts proved, the weight to be given the testimony, and the credibility of the witnesses. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Alvarado v. State*, 912 S.W.2d 199, 207 (Texas. Crim. App. 1995); *Adelman v. State*, 828 S.W.2d 418, 421 (Tex. Crim. App. 1992). The jury is free to accept or reject any or all of the evidence presented by either party. *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991).

11

The jury maintains the power to draw reasonable inferences from basic facts to ultimate facts. *Welch v. State*, 993 S.W.2d 690, 693 (Tex. App.—San Antonio 1999, no pet.); *Hernandez v. State*, 939 S.W.2d 692, 693 (Tex. App.—Fort Worth 1997, pet. ref'd). Moreover, the reconciliation of evidentiary conflicts is solely within the province of the jury. *Heiselbetz v. State*, 906 S.W.2d 500, 504 (Tex. Crim. App. 1995).

Under the *Jackson* standard, the reviewing court is not to position itself as a thirteenth juror in assessing the evidence. Rather, it is to position itself as a final due process safeguard insuring only the rationality of the fact finder. *Moreno v. State*, 755 S.W.2d 866, 867 (Tex. Crim. App. 1988). It is not the reviewing court's duty to disregard, realign, or weigh the evidence. *Id*. The jury's verdict must stand unless it is found to be irrational or unsupported by more than a "mere modicum" of evidence, with such evidence being viewed in the *Jackson* light. *Id*. The legal sufficiency of the evidence is a question of law. *McCoy v. State*, 932 S.W.2d 720, 724 (Tex. App.—Fort Worth 1996, pet. ref'd).

Section 19.02(b) of the Texas Penal Code entitled "murder" provides in pertinent part:

(b)　A person commits an offense if he:

　(1)　intentionally or knowingly causes the death of an individual; [or]

　(2)　intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual; . . .

Tex. Penal Code Ann. § 19.02(b) (West 1994).

The instant indictment alleged in count one that appellant on or about the 20th day of February 1998 in Caldwell County:

12

did then and there intentionally and knowingly cause the death of Henry Silva, by then and there shooting the said Henry Silva with a firearm, and did then and there, with the intent to cause serious bodily injury to Henry Silva, commit an act clearly dangerous to human life, to wit: said Defendant did then and there shoot at the said Henry Silva with a firearm, and said act did then and there cause the death of the said Henry Silva.

The indictment alleged conjunctively the two theories of murder in section 19.02(b)(1), and (2). Tex. Penal Code Ann. § 19.02(b)(1), (2). The trial court charged these theories in the disjunctive when the case was submitted to the trier of facts. The jury's general verdict found appellant "guilty of the offense of murder, as alleged in count 1 of the indictment." When different theories of an offense are submitted to the jury in the disjunctive, as in the instant case, a general verdict is sufficient if the evidence supports either one of the theories. *See Fuller v. State*, 827 S.W.2d 919, 931 (Tex. Crim. App. 1992); *Kitchens v. State*, 823 S.W.2d 256, 257-58 (Tex. Crim. App. 1991); *Roberson v. State*, 16 S.W.3d 156, 159 n.3 (Tex. App.—Austin 2000, pet. ref'd).

The evidence shows that Henry Silva's death resulted from a gunshot wound by a .45 caliber bullet fired by the .45 caliber pistol that was State's exhibit no. 5A. This pistol with a gold trigger was identified by appellant's own gang members and associates as the one appellant carried in his car, and was the one in his possession on the night of February 20, 1998. Appellant pulled this pistol from his pants when he left the Cantu apartment. Shortly thereafter, one witness identified State's exhibit no. 5A as still being in appellant's possession after he crossed the street and stood near a church building. The evidence shows that some shots were fired from this position in the direction of Henry Silva, Chris Baltierra, and Ronnie Valdez. Two .45 caliber shell casings were found near where appellant was standing that night. Both were shown to have been fired by State's exhibit no.

13

5A. This particular weapon was shown to have been the only .45 caliber weapon on the scene or fired during the incident in question. After the shooting, appellant fled the scene in Gonzales's car, which immediately turned from China Street onto Blanco Street. In a yard on Blanco Street near the intersection where the turn was made, the owner of the premises, the very next day, found the gold triggered .45 caliber pistol, State's exhibit no. 5A.

Intent and knowledge are culpable mental states and are to be decided by the jury as fact issues. *Robles v. State*, 664 S.W.2d 91, 94 (Tex. Crim. App. 1984). Proof of a culpable mental state generally relies upon circumstantial evidence. *Hernandez v. State*, 819 S.W.2d 806, 810 (Tex. Crim. App. 1991); *Dillon v. State*, 574 S.W.2d 92, 94 (Tex. Crim. App. 1978). Intent and knowledge can be inferred by the conduct of, remarks by, and circumstances surrounding the acts engaged in by the accused. *Parramore v. State*, 853 S.W.2d 741, 745 (Tex. App.—Corpus Christi 1993, pet. ref'd); *see also Dues v. State*, 634 S.W.2d 304, 305 (Tex. Crim. App. 1982); *Ybarra v. State*, 890 S.W.2d 98, 109 (Tex. App.—San Antonio 1994, pet. ref'd). Conduct before, during, and after an offense may be considered in determining a defendant's culpability. *Barron v. State*, 566 S.W.2d 929, 931 (Tex. Crim. App. 1978).

There are a number of factors in evidence from which the jury could have reasonably concluded that appellant did intend to kill or cause serious bodily injury. There was evidence that there had been difficulties between the LRN and KMM groups both before and during the night in question. When the latest confrontation occurred, appellant took his .45 caliber weapon and said he was going to "start stuff."

14

"A handgun is a deadly weapon *per se*." *Mouton v. State*, 923 S.W.2d 219, 223 (Tex. App.—Houston [14th Dist.] 1996, no pet.); *see also* Tex. Penal Code Ann. § 1.07(a)(17) (West 1994). Specific intent to kill may be inferred from the use of a deadly weapon. *Flanagan v. State*, 675 S.W.2d 734, 744 (Tex. Crim. App. 1982). This is true, unless in the manner of the weapon's use it is reasonably apparent that death could not result. *Godsey v. State*, 719 S.W.2d 578, 581 (Tex. Crim. App. 1986). The .45 caliber weapon shown to have been used in the instant case was a deadly weapon *per se*. *See Sills v. State*, 846 S.W.2d 392, 394 (Tex. App.—Houston [14th Dist.] 1992, pet. ref'd). Evidence the defendant pointed a pistol at the deceased before it discharged is sufficient to show the shooting was intentionally done. *See Giles v. State*, 617 S.W.2d 690, 691 (Tex. Crim. App. 1981). Here, appellant used a .45 caliber handgun and fired in the direction of members of a rival group, who were engaged in a verbal confrontation with his group.

Motive is not an element of a crime and it is never essential for the State to prove it, yet motive obviously is relevant as a circumstance making it more likely that the accused committed the offense with which he is charged. *Martin v. State*, 823 S.W.2d 726, 728 (Tex. App.—Waco 1992, pet. ref'd); *Miranda v. State*, 813 S.W.2d 724, 741-42 (Tex. App.—San Antonio 1991, pet. ref'd); Steven Goode, Olin Guy Wellborn, III, & M. Michael Sharlot, *Guide to the Texas Rules of Evidence: Civil and Criminal* § 401.3, at 95-96 (Texas Practice 1993) (hereinafter Goode).

Actions taken after the event, such as efforts to suppress or fabricate evidence, are also relevant because they permit an inference of consciousness of guilt and hence to actual guilt. *See* Goode § 401.2, at 95-96; *Roberts v. State*, 795 S.W.2d 842, 845 (Tex. App.—Beaumont 1990, no pet.); *Torres v. State*, 794 S.W.2d 596, 598-99 (Tex. App.—Austin 1990, no pet.). The jurors could

15

have inferred a consciousness of guilt in light of appellant's flight from arrest and custody, *see Bigby v. State*, 892 S.W.2d 864, 883 (Tex. Crim. App. 1994), and from the disposition of the pistol to prevent it from being examined to determine if it was the fatal weapon. Goode § 461.3, at 63 (Supp. 1998). Moreover, the jury was free to accept Gomez's testimony that appellant told Gomez that the LRN gang would "take care" of Gomez. Any attempt to threaten a witness is probative of an accused's "consciousness of guilt." *Brown v. State*, 657 S.W.2d 117, 119 (Tex. Crim. App. 1983); *Peoples v. State*, 874 S.W.2d 804, 809 (Tex. App.—Fort Worth 1994, pet. ref'd). Further, the jury could have accepted Cantu's testimony that appellant tried to get Cantu to fabricate evidence that appellant was in San Marcos at the time of the offense.

Viewing the evidence in the light most favorable to the verdict, we conclude that a rational trier of fact could have found, beyond a reasonable doubt, all the essential elements of the murder offense, including the intent to kill or cause serious bodily injury. *Saxton*, 804 S.W.2d at 914. By its verdict, the jury implicitly rejected appellant's defense of alibi. *See Adelman*, 828 S.W.2d at 422. We overrule point of error one.[4]

---

[4] In his challenge to the sufficiency of the evidence, appellant has not raised the sufficiency of the corroboration of the accomplice witness, Carlos Cantu. *See* Tex. Code Crim. Proc. Ann. art. 38.14 (West 1979). We, therefore, did not address the issue in response to point of error one. The State urges that the testimony of Cantu is clearly corroborated by other evidence tending to connect appellant with the murder charged under the standard set by Article 38.14. Without a reiteration of the evidence, we agree with the State. We note that the Court of Criminal Appeals has declined to impose legal and factual sufficiency of evidence standards upon a review of an accomplice witness's testimony under Article 38.14. *See Cathey v. State*, 992 S.W.2d 460, 462-63 (Tex. Crim. App. 1999). The accomplice witness rule is a statutorily imposed sufficiency review, and it is not derived from the federal or state constitutional principles that define legal and factual sufficiency standards. *Id.; Malik v. State*, 953 S.W.2d 234, 240 n.6 (Tex. Crim. App. 1997).

## A Claim of Factual Sufficiency

In the overruled point of error one, appellant expressly challenged only the legal sufficiency of the evidence. In argument thereunder, appellant informs us that he is also challenging the factual sufficiency of the evidence to sustain the conviction. This renders the point multifarious and subject to waiver as the State contends. *See Foster v. State*, 874 S.W.2d 286, 289 (Tex. App.—Fort Worth 1994, pet. ref'd) (citing *Black v. State*, 816 S.W.2d 350, 358 n.11 (Tex. Crim. App. 1991)). It has been said that a factual sufficiency issue should only be considered if "properly raised." *Clewis v. State*, 922 S.W.2d 126, 133 (Tex. Crim. App. 1996); *Haney v. State*, 977 S.W.2d 638, 647 (Tex. App.—Fort Worth 1998, pet. ref'd). A general challenge to the sufficiency of the evidence does not raise, as a matter of course, an issue of factual sufficiency in a criminal case, *Markey v. State*, 996 S.W.2d 226, 229 (Tex. App.—Houston [14th Dist.] 1999, no pet.), nor does a mere challenge of "insufficient" suffice. *Haney,* 977 S.W.2d at 647.

Appellate counsel should brief separately any complaints regarding legal and factual sufficiency for the evidence to support the conviction, *Nevels v. State*, 954 S.W.2d 154, 159 n.4 (Tex. App.—Waco 1997, pet. ref'd), and include information on the appropriate standard of review in each point. *Deckard v. State*, 953 S.W.2d 541, 543 n.3 (Tex. App.—Waco 1997, pet ref'd). As explained in *Martinets v. State,* 884 S.W.2d 185, 188-89 (Tex. App.—Austin, 1994, no pet.) (op. on reh'g), legal sufficiency involves the United States Constitution and factual sufficiency involves the Texas Constitution. Combining both federal and state constitutional grounds in a single point of error risks rejection on the ground that the contention is multifarious and presents nothing for review. *See Sterling v. State*, 800 S.W.2d 513 521 (Tex. Crim. App. 1990); *see also Lawton v. State*, 913 S.W.2d

542, 558 (Tex. Crim. App. 1995). Nevertheless, we shall, in the interest of justice, consider the factual sufficiency issue although not properly briefed.

A factual sufficiency of the evidence review begins with the presumption that the evidence supporting the judgment was legally sufficient. *See Clewis*, 922 S.W.2d at 134. In such a review, we consider the evidence without employing the prism of "in the light most favorable to the verdict." *Id.* at 129. A reviewing court must consider all the evidence impartially, comparing evidence that tends to prove the existence of a disputed fact or facts with evidence that tends to disprove that fact or those facts. *Santellan v. State*, 939 S.W.2d 155, 164 (Tex. Crim. App. 1997). The verdict or judgment is to be set aside only when the factual finding is against the great weight and preponderance of the evidence so as to be clearly wrong and unjust. *Clewis*, 922 S.W.2d at 129. In the factual sufficiency analysis, it must be remembered that the trier of fact is the sole judge of the weight and credibility of the testimony. *Santellan*, 939 S.W.2d at 164. Appellate courts should be on guard not to substitute their own judgment in these matters for that of the trier of fact. *Id.* One principle of the factual sufficiency analysis is deference to the findings of the jury or other fact finder. *Cain v. State*, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997). Moreover, "[a] decision is not manifestly unjust merely because the jury [or fact finder] resolved conflicting views of the evidence in favor of the *State*." *Id*. at 410.

In the latest clarification of the standard of review involved, the Court of Criminal Appeals made clear that the *Clewis* criminal factual sufficiency review encompasses both formulations utilized in civil jurisprudence. Thus, in conducting a *Clewis* sufficiency review of the elements of a criminal conviction, an appellate court must ask whether a neutral review of all the evidence, both

18

for or against the finding, demonstrates that the proof of guilt is so obviously weak as to undermine the confidence in the jury's determination, or that the proof of guilt, although adequate taken alone, is greatly outweighed by contrary proof. *Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000).

Here, appellant's argument on legal and factual insufficiency is commingled. While appellant cites *Clewis* and *Johnson*, it is difficult to determine which approach appellant is using. Apparently, appellant is claiming the evidence is so obviously weak that it is factually insufficient.

We need not reiterate the evidence. We have made a neutral review of all the evidence including the evidence supporting the State's version of the facts and the evidence showing appellant was in San Marcos at the time of the offense. We conclude, giving due deference to the jury's verdict, that the verdict is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. The other part of point of error one is overruled.

**Sufficiency of Evidence—Aggravated Assault Convictions**

In points of error two and three, appellant contends that the evidence was "legally insufficient" to support the convictions for aggravated assault upon Ronnie Valdez and Chris Baltierra.

Appellant offered only one argument for points of error one, two, and three. A careful examination of that argument set forth in appellant's brief clearly shows that it pertains only to the murder conviction. As to the other convictions, there is no mention of the complainants' names, the elements of the offense of aggravated assault, or just how the evidence is insufficient to support these particular convictions. No authorities are cited clearly pertaining to points of error two and three. No record references are made concerning these matters.

19

The appellate brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record. Tex. R. App. P. 38.1(h). Points of error two and three have not been adequately briefed and present nothing for review. *See Lawton*, 913 S.W.2d at 554; *Foster v. State*, 779 S.W.2d 845, 864 (Tex. Crim. App. 1989).

Nevertheless, we have examined the contentions under the standards of review for legal and factually insufficiency claims. We find no merit in appellant's contentions. Points of error two and three are overruled.

### Sudden Passion Arising From an Adequate Cause

Appellant's fourth point of error complains of the jury's finding that the murder alleged "was committed without sudden passion, adequate cause, and immediate influence was against the preponderance of the evidence adduced at trial." Section 19.02(a) of the Penal Code provides in pertinent part:

(a)  In this section:

   (1)  "Adequate cause" means cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection.

   (2)  "Sudden passion" means passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation.

* * * *

(d)  At the punishment stage of a trial, the defendant may raise the issue as to whether he caused the death under the immediate influence of sudden passion arising from an adequate cause. If the defendant proves the issue in the

20

affirmative by a preponderance of the evidence, the offense is a felony of the second degree.

Tex. Penal Code Ann. § 19.02(a)(1)-(2), (d) (West 1994).

"The existence of sudden passion is simply a mitigating factor relevant to punishment, and the burden of proving sudden passion by a preponderance of the evidence during the punishment phase rests on the defendant." *Rainey v. State*, 949 S.W.2d 537, 541 (Tex. App.—Austin 1997, pet. ref'd); *accord Perez v. State*, 940 S.W.2d 820, 821 (Tex. App.—Waco 1997, no pet.).

At the punishment stage of the instant trial, the issue of sudden passion arising from an adequate cause was submitted to the jury under proper instructions. By assessing punishment at twenty-five years' imprisonment for murder, the jury implicitly rejected second-degree felony punishment. *See* Tex. Penal Code Ann. § 12.33 (West 1994) (providing for a range of penalty from two to twenty years' imprisonment for a second-degree felony). This was in accordance with the trial court's jury instructions which told the jury to assess punishment as a first-degree felony if it did not believe by a preponderance of the evidence that the offense was committed under the influence of sudden passion arising from an adequate cause. There was no written finding by the jury nor was one required by law or the trial court's instructions. Appellant has reference only to an implied jury finding at the punishment stage of the bifurcated trial.

Appellant did not testify at trial. In his brief, appellant calls our attention only to evidence at the guilt/innocence stage of the trial. He urges that this evidence shows that Carlos Cantu, Angel Gomez, Mary Rivera, and others were caught by surprise when the KMM group arrived at the Cantu apartment in several vehicles. Appellant concludes that "[w]hat occurred was a sudden

21

reaction to a sudden situation in which the appellant and his group were placed." None of this evidence shows that appellant himself was acting under the immediate influence of sudden passion arising from an adequate cause. Appellant overlooks the defense testimony offered at the first stage of the trial that he was not at the scene on the occasion in question but in San Marcos.

The jury as the trier of fact could have accepted or rejected any witness's testimony. *See Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986). Reconciliation of evidentiary conflicts is solely the function of the trier of fact. *Miranda*, 813 S.W.2d at 733-34.

Appellant had the burden of proof. In this regard, he failed. We conclude that a rational trier of fact, in assessing punishment for murder, could have found that the mitigating factor was not established by a preponderance of the evidence. The fourth point of error is overruled.

### Effective Assistance of Counsel

The last point of error states:

> Point of error no. 5: The appellant was denied the effective assistance of counsel, as guaranteed by the sixth and fourteen amendments to the United States Constitution and Article I, Section 10 of the Texas Constitution and is entitled to a reversal of his conviction under the standards set out in *Strickland v. Washington*, 460 U.S. 668, 109 S. Ct. 2052; *Hernandez v. State*, 726 S.W.2d [sic] (S.F. IV - VII).

The foregoing is all that is offered. No other authorities are cited and no argument is advanced. We are only generally referred to four volumes of the court reporter's record. We are not told how counsel was ineffective. There has been no compliance with our briefing rules and nothing is presented for review. The fifth point of error is overruled.

The judgments are affirmed.

_____

John F. Onion, Jr., Justice

Before Justices Kidd, B. A. Smith and Onion[*]

Affirmed

Filed:   February 15, 2001

Do Not Publish

---

[*]   Before John F. Onion, Jr., Presiding Judge (retired), Court of Criminal Appeals, sitting by assignment.  *See* Tex. Gov't Code Ann. § 74.003(b) (West 1998).