COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-06-316-CR

NO. 2-06-317-CR

NO. 2-06-318-CR

 

 

TERRY LEE HORNBUCKLE                                                     APPELLANT

A/K/A TERRY HORNBUCKLE

                                                                                                        

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

           FROM THE 372ND
DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------








A jury convicted Appellant Terry Lee Hornbuckle
of sexual assault of three women, with each offense alleged in a separate
indictment.  The jury assessed Appellant=s
punishment at fifteen years=,
fourteen years=, and ten years=
confinement respectively in the Institutional Division of the Texas Department
of Criminal Justice and additionally assessed a fine of $10,000 in each
case.  The trial court sentenced
Appellant accordingly and ordered the time to be served concurrently but the
fines to be paid individually.  

On appeal, Appellant challenges both the legal
and factual sufficiency of the evidence in each case.  Additionally, Appellant challenges the
admission of evidence concerning extraneous offenses and bad acts.  Because we hold that the evidence is both
legally and factually sufficient and that the trial court did not reversibly
err, we affirm the trial court=s
judgments.

I.  Background Facts

Appellant appeals his convictions on charges of
sexual assault of three women: K.B., Jane Doe (a pseudonym), and Kate Jones (a
pseudonym). 








Appellant
was the bishop at Agape Christian Fellowship Church in Arlington, Texas.  At trial, K.B. testified that she had
attended Agape Christian Fellowship Church for about seven years; Appellant was
her bishop during that time, and she considered him to be her spiritual
advisor.  She testified that on Saturday,
July 31, 2004, Appellant called her on her cell phone, and during the
conversation, he stated that he wanted to give her something for her
birthday.  He asked her to meet him at a
Wendy=s
restaurant so that he could Aput a
blessing and a seed in [her] hand,@ which
she took to mean a compact disc (CD); congregation members would sometimes be
given tapes or CDs of excerpts from his preaching.  He also told her that he wanted to give her a
check; K.B. testified that she had known him to give money to other people in
the church. 

At Wendy=s,
Appellant told her to get into his car because he needed to go get his
checkbook.  She rode with him to an
apartment complex.  Once there, he
invited her inside and gave her a beverage, which he said was Kool-Aid.  According to K.B., the drink was bitter.  He told her to Amake
herself at home@ and Alook
around@ while
he looked for the man who he claimed owned the apartment and had his
checkbook.  K.B. testified that after a
time, she began getting sleepy.  At some
point, she took a picture with the camera on her cell phone.  She testified that she sat on a couch, and
then the next thing she can remember from that point is hearing a phone ring
and feeling Alike a person was getting off of
[her].@  She saw Appellant, who was naked, go into the
bathroom.  At that point, she too was
naked.  She stood up and began getting
dressed, feeling dizzy.  Appellant came
out of the bathroom, told her that Ahe wasn=t done,@ and put
her on the bed.  She testified that Ahe used
his hand . . . to guide his penis in,@ and
that Ait felt
like when you try to put a tampon in and it hurts to go up.@  The following Monday, K.B. went to a
hospital, where she tested positive for benzodiazepine.








Doe
testified that she had attended Agape Christian Fellowship Church for about
three years, beginning in 1999.  She
considered Appellant to be her bishop.  A
few weeks after she started attending the church, her boyfriend ended their
relationship, and she contacted Appellant Alooking
for some type of guidance.@  Appellant came to her apartment with a bottle
of wine.  Doe drank some wine that he
poured for her.  After a while, she began
to experience Aa numb feeling, a relaxed, just
kind of careless feeling.@ 
Appellant began massaging her back; Doe testified that as he was
massaging her back, she Afelt the part of the back of
[her] pants being moved down.@  She remembered nothing from that time until
she woke up later; Appellant was gone at that point.  When she woke up, she was still clothed.  

Doe
testified that through attending the church, she became spiritually and
emotionally dependent on Appellant. 
Eventually, they developed a sexual relationship; Doe testified that she
initially told him, ANo,@ but
gave in because Ait seemed easier.@  She testified that she got out of the
relationship by moving, changing her phone number, and Abasically
just disappearing from everybody.@ 








Jones
testified that in the summer of 2004, Appellant approached her while she was at
her health club.  They talked and
exchanged phone numbers.  A few days
later, Appellant called Jones and asked if he could come to her home.  When he arrived at her home, he brought a
black bag with him that contained drug paraphernalia.  Appellant and Jones smoked methamphetamine
that he had brought.  Jones told
Appellant about problems that she had had with men in the past; she testified that
he told her that AGod brought him into [her] life
to teach [her] how to trust in a man.@ 

Sometime
in late summer, Appellant came to her home again, and they again used
drugs.  Appellant went into the kitchen
and got some water for Jones, which she drank. 
After she drank the water, she started Acoming
down very fast@ from the high she had had from
the drugs.  She began losing track of the
conversation, and she felt her body getting weak and tired until she blacked
out.  She remembered coming to in her
bed.  Neither she nor Appellant was
dressed.  Jones got up, and as she did
so, she observed what appeared to be semen coming out of her vagina.  She testified that she did not consent  to sex with Appellant.

II.  Legal
and Factual Sufficiency of the Evidence

 

A.  K.B.

 








In his
first point, Appellant argues that the evidence is both legally and factually
insufficient to sustain a conviction for the sexual assault of K.B. because the
evidence is insufficient as to penetration and penile penetration.  The indictment charged in the first paragraph
of the sole live count that Appellant intentionally or knowingly caused the
penetration of K.B.=s female sexual organ by
inserting his penis into her female sexual organ without her consent and that
he knew she was unable to consent because she was unconscious or physically
unable to resist.  In the second paragraph,
the indictment charged Appellant with penile penetration of K.B.=s female
sexual organ without her consent and further alleged that he had intentionally
impaired her power to appraise or control her conduct by administering a
substance without her knowledge.

At
trial, K.B. did not testify specifically that Appellant had penetrated her
because she said she was a virgin and had no idea what penetration felt
like.  She did, however, testify that it
felt like Awhen you try to put a tampon in
and it hurts to go up.@   When a frustrated prosecutor asked, ADid this
man steal your virginity?@ 
K.B. replied, AI honestly don=t know
what happened that night, but he raped me, and I don=t know
the extent of it, but something was done to me that had not been done to me
before.@ When
asked directly if Appellant penetrated her, she replied, AAll I
can say is the feeling was like that tampon. 
That=s all I can say, because it=s justCit=s like
you=re
trying to put something in that it can=t go
up.  There=s no
hole for it to go into and it just hurts.@  The prosecutor questioned, AHis
penis contacted your vaginal area, correct?@  K.B. replied, AYes.@  The prosecutor asked, AAnd that
was painful?@ 
K.B. answered, AI felt pain.@








Appellant
argues that this evidence is insufficient to prove both penetration and penile
penetration.  There is, however, further
testimony regarding this matter.  K.B.
testified, AI remember him sliding my
panties down and tryingChe used his hand to turn the
light on and the other hand to guide his penis in.@  Trying to clarify, the prosecutor asked, AAnd he
used his hand to guide his penis inside you?@  K.B. replied, AYes.@  Then, when the prosecutor asked if Appellant
had penetrated her, she replied merely, AIt hurt.@  It was when asked what it felt like that she
described it as feeling like trying to put a tampon in.       Consequently, there is evidence from K.B. that Appellant used
his hand to guide his penis inside her, it hurt, it felt like trying to put a
tampon in, and Aand it hurt to go up.@








The
State was required to prove only penetration of the labia.[2]  Further, we can take judicial knowledge of
the meaning of the word tampon and its normal use.[3]
Applying the appropriate standards of review,[4]
we hold the evidence both legally and factually sufficient to support Appellant=s
conviction for the sexual assault of K.B. and overrule Appellant=s first
point.  

B.  Jane
Doe

In his
second point, Appellant argues that the evidence is both legally and factually
insufficient to sustain his conviction for the sexual assault of Jane Doe on
the issue of clergyman-induced consent. 
Section 22.011(b)(10) of the penal code provides that sexual intercourse
is without consent if Athe actor is a clergyman who
causes the other person to submit or participate by exploiting the other person=s
emotional dependency on the clergyman in the clergyman=s
professional character as spiritual advisor.@[5]  Appellant does not challenge the
constitutionality of this provision.  








Jane Doe
began a sexual relationship with Appellant when she called him after a very
emotional breakup with her boyfriend. 
She had attended Appellant=s church
and considered him her bishop, although she did not become an official
member.  In her testimony, Doe described
her emotional state at the time she called Appellant after the breakup with her
boyfriend:  AI was
looking for some type of guidance, someone to talk to.  I was very devastated.  I was very emotional and I was just looking,
at that point in time, for someone to talk to and to help me and to guide me
through this time in my life.@  That same night, she invited Appellant into
her home, and he arrived with a bottle of wine and a little black
notebook.  They began to discuss the
problem with the boyfriend, and she testified, AI was
very emotional at that point in time.  I
was absolutely devastated that the love of my life had just walked out on me.@  She drank wine with Appellant, and he
massaged her shoulders.  When she woke
up, clothed, Appellant was gone.

Weeks
later, Appellant wanted to meet with Doe at her home to speak to her about her
personal problems.  She testified that
she was feeling that he had taken advantage of her weakness.  At this second visit, he counseled with her
about deeper issues.  She testified that
she told him her deepest, darkest secrets and that she believed that he preyed
on her because of her weaknesses.  She
testified that she believed that he knew when he saw her in church that she
could be the one that he could Ado this
to.@  She testified that Appellant would say he
could love her and that Ahe knew the void of my life was
my mother and he knew that the only time that my mother would tell me that she
loved me was when she was drinking, and I told him all of this information.@








Doe
testified that as he told her he could love her, he would comfort her and get
closer to her.  They ended up having
sex.  She testified that she told him, ANo,@ but
that he would continue and she would eventually give in.  When asked why she would give in, she
testified, AIt honestly seemed easier.  I was scared. 
I was afraid.  And my body, it was
so weak at the time with . . . everything I was going
through, it seemed . . . easier . . . just to let it happen than just to scream
and fight and run to the police.@  There were approximately four or five
meetings between Appellant and Doe at her house.  All of the meetings basically happened the
same way:  Appellant would come over to
comfort her.

Appellant
argues that although Doe initially looked at him as a spiritual advisor, later
it was clear that they were meeting for a sexual relationship and not for
spiritual counseling.  Doe insisted that
she was afraid of him and that she never made a distinction between Appellant
the man and Appellant the bishop.  She
testified that she always looked at him as her bishop.








Appellant
also argues that section 22.011(b)(10) in no way forbids a man who happens to
be a preacher and a spiritual advisor from having an affair with a woman who
happens to be a member of his church.  He
argues that the law requires both the exploration of the complainant=s
emotional dependency on the actor while in his professional role as a spiritual
advisor and also the actor=s
purposeful exploitation of that emotional dependency.  The Texas statute is somewhat broader than
Appellant=s interpretation.  The statute requires only that the actor be a
clergyman who causes the other person to submit or participate in the sexual
activity while the clergyman is acting as a spiritual advisor.[6]  Doe testified that Appellant was her bishop
and that he caused her to submit to his sexual advances by exploiting her
emotional dependence on him as her spiritual advisor. 

We are
not in a position to judge the credibility of Doe=s
testimony.[7]  That is the function of the jury.[8]  Thus, applying the appropriate standards of
review,[9]
we hold that the evidence is both legally and factually sufficient to support
Appellant=s conviction for the sexual
assault of Jane Doe and overrule his second point.

C.  Kate Jones

 








In his
third point, Appellant challenges the legal and factual sufficiency of the
evidence supporting his conviction for the sexual assault of Kate Jones.  The indictment charged that Appellant caused
the penetration of Jones=s female sexual organ by
inserting his penis into it without her consent and that Appellant knew Jones
was unable to consent because she was unconscious and physically unable to
resist.  Alternatively, the indictment
alleged penetration without Jones=s
consent because Appellant knew that she was unaware that the sexual assault was
occurring or, alternatively, that penetration was without her consent because
Appellant had intentionally impaired her power to appraise or control her
conduct by administering a substance without her knowledge. 

When
different theories of the offense are submitted to the jury in the disjunctive,
as in the case now before this court, a general verdict is sufficient if the
evidence supports any one of the alternative theories.[10]  Additionally, the case now before this court
is a circumstantial evidence case, but the standard of review is the same in
both direct and circumstantial evidence cases.[11]








Unlike
K.B. and Doe, Jones was not a member of the church and did not know Appellant
as a bishop.  Instead, she met him at the
health club where they both worked out. 
She invited him to her home, and they smoked methamphetamine
together.  She testified that she told
him that she had trust issues with men and that he had told her that God had
brought him into her life to teach her how to trust in a man and to show her
that Appellant was going to be a friend to her. 
Nothing of a physical or sexual nature happened during the first
visit.  She also testified that Appellant
told her not to tell anyone that she knew him and that when she asked why, he
replied, ABecause the press would eat me
alive.@  She told him, AYou=re just
a counselor for the Cowboys, for the rookies, why would that matter?@ He
replied, ATrust me, they will.@

The
second time Appellant came to Jones=s home,
the evidence shows that

$                  
Jones and Appellant were dressed and using
methamphetamine in her living room, 

$                  
Appellant took her water bottle off the table and
apparently filled it up from her water cooler in the kitchen, because she heard
it bubble,

$                  
the water cooler could not be seen from the
living room, 

$                  
Appellant told Jones that because of the drugs
and her earlier workout, she was going to get too dehydrated and really needed
to drink the water, and A[h]e was a little insistent
about it,@

$                  
about fifteen to twenty minutes after she drank
the water, although she had been very high on methamphetamine, her body started
coming down extremely fast.  








She also
testified that she was losing track of conversation, of what Appellant was
saying, and of what was going on.  Her
body was getting weak, tired, and very, very heavy, to the point where she
could not move.  She testified that she
blacked out.  Jones described her
blackout as the type Awhere [she] knew what [she] was
doing at one moment and then there=s a time
frame [she had] no idea what occurred, and then all of a sudden [she] knew what
[was] going on again.@








She also
testified that this feeling was different than she had felt when coming down
from a high off drugs and like nothing she had experienced before: AFor as
up as I was to come that down and black out, it was very powerful.@  She testified that she believes that he
slipped a drug into her water without her knowledge.  The last thing she remembers happening in the
living room was A[h]im asking [her] if she was
still with him [and] to stay awake.@  She was unable to respond.  The next thing she remembered was coming to,
naked, in her bed; she did not know how she ended up in the bedroom.  Appellant was also naked in her bedroom, and
she asked him what was going on.  He told
her that everything was okay, that she had wanted a massage, that she could
trust him, and that he was her friend. 
She testified that she told him that something was wrong and asked him
to leave.  When Jones stood up, she felt
and observed what she described as his semen or ejaculation coming from her
vagina.  Based on her A[w]aking
up without [her] clothes on@ and Athat
coming out of [her],@ she then Aknew
what he had done,@ even though she could not state
for a fact that his penis had entered her vagina because she did not remember; A[she]
was blacked out.@ 


Jones
testified that she did not give Appellant permission to have sexual intercourse
with her on that date and that she was not aware that sexual intercourse had
occurred until she saw his naked body, her naked body, and the semen coming
from her vagina.  Before he left, Appellant
gave Jones a hundred dollars.  Jones left
him a message telling him not to contact her again.  Jones did not report these events until after
she learned Appellant=s true identity and that he had
been arrested for sexual assault.








The only
evidence of sexual assault, Appellant argues, is Jones=s
testimony that she got out of bed and Afelt
semen coming out of her body.@  Appellant argues that there was no medical
testimony or lab testing that reflected what the substance that she said came
out of her could have been.  Apparently,
Appellant is arguing that expert testimony is necessary to prove that Jones
felt semen coming from her vagina.  While
it is clear that some things are such common knowledge that they do not require
expert testimony, we understand Appellant=s
argument to be that distinguishing between semen and other substances is not part
of such common knowledge.  Consequently,
a person would be competent to testify that vomit came from her mouth, that she
experienced diarrhea, or that she was bleeding because all males and females
normally have this common experience. 
But, Appellant apparently posits, a woman could not competently testify
that the substance coming from her vagina and running down her legs was
semen.  

Jones
was a woman not inexperienced in sexual intercourse.  She had been involved in a sexual
relationship with at least one man, had a daughter, and also had been
married.  In response to the question, AThe C
substance and the consistency and the, I guess, how it came out of your body,
were you familiar with that feeling?@, she
answered, AYes, ma=am,@ and
also testified that that feeling indicated to her that Appellant had had sex
with her. Specifically, she indicated that the substance coming out of her body
indicated that he had ejaculated inside of her female sexual organ.

Appellant
has not directed us to any portion of the record in which he objected that she
was incompetent to testify that the substance coming from her vagina was semen,
but he did try to establish on cross-examination that it could have been a
different substance.








 As Abraham Lincoln is reputed to have made
clear, evidence of something coming out may be sufficient evidence that something
went in.  A witness may not see someone
bite off the ear of an opponent during a fight, but the witness=s
observation of the person spitting the ear out supports the conclusion that the
person did indeed bite the ear off.[12]   Similarly, in this case, the testimony that,
after a period of being unaware of what was going on, Jones found herself with
Appellant in the bedroom undressed, and when she stood up, felt semen come from
her vagina and run down her legs is evidence of penetration and
ejaculation.  We may take judicial notice
that ejaculate, or semen, comes from a penis.[13]  The only penis in the room was Appellant=s. Applying the appropriate standards of review,[14]
we hold that the evidence is both legally and factually sufficient to support
the jury=s
verdict that Appellant sexually assaulted Kate Jones, and we overrule Appellant=s third
point.

III.  Extraneous
Offenses and Acts of Misconduct 

In his
final three points, Appellant argues that the trial court erred by admitting
evidence of extraneous offenses and acts of misconduct. 

 

 








 A.  Lisa Fuller

Appellant
argues in his fourth point that the testimony from Lisa Fuller is inadmissible
under rules 403 and 404 because it is irrelevant, highly prejudicial,
inflammatory, and had no probative value. 
Rule 404(b) of the Texas Rules of Evidence provides in pertinent part:  

Evidence
of other crimes, wrongs or acts is not admissible to prove the character of a
person in order to show action in conformity therewith.  It may, however, be admissible for other
purposes, such as proof of motive, opportunity, intent, preparation, plan,
knowledge, identity, or absence of mistake, or accident.[15]

Rule 403
provides that relevant evidence Amay be
excluded if its probative value is substantially outweighed by the danger of
unfair prejudice, confusion of the issues, or misleading the jury, or by
considerations of undue delay, or needless presentation of cumulative evidence.@[16]








Fuller
testified that Appellant directed her to lie to the grand jury and attempted to
intimidate her as a witness.  He tried to
get her to reveal her grand jury testimony and to portray him favorably to a
defense investigator.  This court has
held that when a witness has been threatened or someone has attempted to coerce
that witness=s testimony, evidence concerning
those actions is admissible to show the accused=s Aconsciousness
of guilt.@[17]  Additionally, as the State points out, the
Texas Court of Criminal Appeals has stated the standard for admitting
consciousness-of-guilt evidence that involves an obstruction of justice: 

criminal acts that are
designed to reduce the likelihood of prosecution, conviction, or incarceration
for the offense on trial are admissible under Rule 404(b) as showing Aconsciousness of guilt.@  These include threats against . . . witnesses
and their families.[18]

 

We
therefore hold that the evidence was admissible under rule 404(b).          Similarly,
based on our review of the record, we hold that the trial court could have
properly concluded after a rule 403 balancing test that the probative value of
Fuller=s
testimony was not substantially outweighed by the danger of unfair prejudice,
confusion of the issues, or misleading the jury, or by considerations of undue
delay, or needless presentation of cumulative evidence.[19]  We therefore hold that the trial court did
not abuse its discretion by admitting Fuller=s
testimony.  We overrule Appellant=s fourth
point.

 








B.  Lisa Mikals

In his
fifth point, Appellant argues that the trial court erred by admitting
extraneous evidence and bad acts testimony from Lisa Mikals concerning their
consensual sexual affair.  

Mikals
was a married member and employee of the church.  She and Appellant had engaged in a sexual
relationship for two years.  She rented
an apartment to facilitate their ongoing sexual meetings.

Over
objection, she was allowed to testify that during this relationship with
Appellant, she felt he had degraded her, yelled at her, and stalked her, and he
threatened her when she testified before the grand jury, causing her to perjure
herself. 

Mikals
testified that Appellant confronted her prior to her grand jury testimony and
told her to represent him in a good lightCas a
pastor, husband, and father.  He also instructed
her to call other grand jury witnesses to find out what questions they had been
asked.  He told her to keep their sexual
relationship secret and not to mention the apartment.








Mikals
also testified that he told her he had dogs on the street and connections, and
if she did not do what he told her to do, her character would not stand up
against his.  She claimed that that was
the reason she lied to the grand jury. 
She testified that he also became angry and abusive when she refused to talk
with his investigator and instead hired an attorney. 

As we
discussed above, a defendant=s
attempts to tamper with a witness are admissible under rule 404(b) as evidence
of consciousness of guilt.[20]  Based on our review of the record, we also
conclude that the trial court could have 
properly found that the probative value of Mikals=s
testimony was not substantially outweighed by the danger of unfair prejudice,
confusion of the issues, or misleading the jury, or by considerations of undue
delay, or needless presentation of cumulative evidence.[21]  We therefore hold under the limited facts of
this case that the trial court did not abuse its discretion by admitting  Mikals=s
testimony.  We overrule Appellant=s fifth
point.

C.  Alisa Lewis
and Mary Gressett

In his
sixth point, Appellant argues that the trial court erred by admitting
extraneous bad acts testimony from Alisa Lewis and Mary Gressett concerning
attempted sexual conduct.  Appellant
voiced rule 404(b) and 403 objections to their testimony.  








Lewis
testified that five years before trial, Appellant had come to her home to
counsel her and to help her create a budget. 
While he was at her home, he tried to kiss her.  She told him to leave, and he did.

While
this conduct is in some ways similar to the conduct described by the three
complainants, it happened several years before and only tenuously fits into the
404(b) exceptions.[22]  We therefore hold that the trial court abused
its discretion by admitting it.  Because
the evidence was minimally inflammatory, considering the gravity of the three
charged offenses in comparison, we hold that the error was harmless.[23]  

Gressett,
on the other hand, testified that Appellant made a pass at her four years
before trial.  He had come to her home
with wine to help her financially and give her guidance while her husband was
away in a drug rehabilitation center. 
Appellant gave her a back rub and, when his hands went down the back of
her skirt on to her bare skin, she confronted him and asked him to leave. 








This
testimony was sufficiently similar to the testimony of the complainants to be
admissible under rule 404(b).[24]  The defense vigorously challenged the
testimony of the complainants who testified to similar actions by
Appellant.  This vigorous defense opened
the door to testimony of similar conduct as part of the State=s
rehabilitation of the challenged witnesses. 
Specifically, as the State points out, evidence that Appellant had
subjected Gressett to the same scenario he used on K.B., and offered to provide
her with counseling and support, is admissible to rebut Appellant=s
suggestions that K.B. had set Appellant up and was lying.[25]  Again, based on our review of the record, we
cannot say that the probative value of Gressett=s
testimony was substantially outweighed by the danger of unfair prejudice,
confusion of the issues, or misleading the jury, or by considerations of undue
delay, or needless presentation of cumulative evidence.[26]  The trial court therefore did not abuse its
discretion by admitting Gressett=s
testimony.  We overrule Appellant=s sixth
point.

IV.  Conclusion

Having
overruled all of Appellant=s
points, we affirm the trial court=s
judgments.

 

LEE ANN DAUPHINOT

JUSTICE

 

PANEL
A:  CAYCE, C.J.; DAUPHINOT and MCCOY, JJ.

DO NOT PUBLISH








Tex. R. App. P. 47.2(b)

 

DELIVERED:
May 22, 2008











[1]See Tex.
R. App. P.
47.4.





[2]See Vernon v. State, 841 S.W.2d 407, 409
(Tex. Crim. App. 1992).





[3]See Tex. R. Evid. 201.





[4]See Jackson v. Virginia, 443 U.S. 307, 319, 99
S. Ct. 2781, 2789 (1979); Clayton v. State, 235 S.W.3d 772, 778 (Tex.
Crim. App. 2007) (both providing legal sufficiency standard of review); Watson
v. State, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006); Drichas v. State,
175 S.W.3d 795, 799 (Tex. Crim. App. 2005); Sims v. State, 99 S.W.3d
600, 603 (Tex. Crim. App. 2003); Johnson v. State, 23 S.W.3d 1,
11 (Tex. Crim. App. 2000) (all providing factual sufficiency standard of
review).





[5]Tex.
Penal Code Ann.
' 22.011(b)(10) (Vernon
Supp. 2007).





[6]See id.





[7]See Johnson, 23 S.W.3d at 12; Dewberry
v. State, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999), cert. denied,
529 U.S. 1131 (2000); Cain v. State, 958 S.W.2d 404, 407 (Tex. Crim.
App. 1997).





[8]See
Tex. Code Crim. Proc. Ann. art. 38.04 (Vernon 1979); Margraves v. State, 34 S.W.3d 912,
919 (Tex. Crim. App. 2000); Johnson, 23 S.W.3d at 8.





[9]See Jackson, 443 U.S. at 319, 99 S.
Ct. at 2789; Clayton, 235 S.W.3d at 778 (both providing legal
sufficiency standard); Watson, 204 S.W.3d at 414; Drichas, 175
S.W.3d at 799; Sims, 99 S.W.3d at 603; Johnson, 23 S.W.3d at 11
(all four providing factual sufficiency standard).





[10]Herrin v. State, 125 S.W.3d 436, 441
(Tex. Crim. App. 2002). 





[11]Burden v. State, 55 S.W.3d 608, 612B13 (Tex. Crim. App.
2001).





[12]See Gertrude Block, Punctuated
Lawyer, 43 Fed. L. 7, 7
(1996).





[13]See Tex. R. Evid. 201(b), (c).





[14]See Jackson, 443 U.S. at 319, 99 S.
Ct. at 2789; Clayton, 235 S.W.3d at 778 (both providing legal
sufficiency standard); Watson, 204 S.W.3d at 414; Drichas, 175
S.W.3d at 799; Sims, 99 S.W.3d at 603; Johnson, 23 S.W.3d at 11
(all four providing factual sufficiency standard).





[15]Tex.
R. Evid.
404(b).





[16]Tex.
R. Evid.
403.





[17]Peoples v. State, 874 S.W.2d 804, 809
(Tex. App.CFort Worth 1994, pet. ref=d).  





[18]Ransom v. State, 920 S.W.2d 288, 299
(Tex. Crim. App. 1994) (op. on reh=g) (citations omitted), cert. denied, 519
U.S. 1030 (1996).





[19]See Tex.
R. Evid.
403.





[20]Ransom, 920 S.W.2d at 299.





[21]See Tex.
R. Evid.
403.





[22]See Tex. R. Evid. 404(b).





[23]See Tex. R. App. P. 44.2(b).





[24]See Tex. R. Evid. 404(b).





[25]See Wheeler v. State,
67 S.W.3d 879, 885B89 (Tex. Crim. App.
2002); Casey v. State, 215 S.W.3d 870, 879 (Tex. Crim. App. 2007).





[26]See Tex.
R. Evid.
403.