Johnny Mack PEOPLES, Jr., Appellant,

v.

The STATE of Texas, State.

No. 2–93–079–CR.

Court of Appeals of Texas,
Fort Worth.

March 30, 1994.

Rehearing Denied May 3, 1994.

Hill, Beatty, Butcher & Gallagher, and Allan K. Butcher, Fort Worth, for appellant.

Tim Curry, Crim. Dist. Atty., Betty Marshall and Charles M. Mallin, Asst. Chiefs, Appellate Section, Edward L. Wilkinson, Mitch Poe, and Leslie Hardy, Assts., Fort Worth, for appellee.

Before FARRIS, LATTIMORE and DAY, JJ.

## OPINION

DAY, Justice.

Johnny Mack Peoples, Jr. appeals his conviction for the murder of Edward West. TEX.PENAL CODE ANN. § 19.02(a)(2) (Vernon 1989). The jury assessed punishment at thirty-three years confinement.

We affirm.

Peoples raises four points of error on appeal. In point one, he complains the trial court improperly refused to grant a mistrial after the prosecutor injected her personal opinion about the credibility of a key defense witness and the witness's testimony. In point two, he contends the trial court erroneously admitted punishment evidence about the agony West's mother suffered when her son died in her arms. In point three, he complains the trial court improperly refused to grant a mistrial after the prosecutor brought forward evidence of an unnamed extraneous offense. In point four, he contends his conviction is invalid because of prosecutorial misconduct.

■ Turning to point one, Peoples complains of the following prosecutorial argument, made at the punishment phase of trial:

> The people who testified for him [Peoples]—I'm sure he was probably a really cute toddler, too. I don't care what his eighth grade teacher has to say about him, and neither should you.

The trial court sustained defense counsel's objection to the prosecutor giving her personal opinion and instructed the jury to disregard the comment. The court denied the defense's motion for a mistrial, however.

Peoples contends the prosecutor committed reversible error in making this argument because she injected her personal opinion about the credibility of a particular witness. He further contends the prosecutor "specifically stated her opinion that this important defense witness was not worthy of belief" and encouraged jurors to defer to her evaluation of the witness's testimony. The contested argument does not support these contentions because the prosecutor did not mention the credibility of the witness or the witness's testimony.

■ Assuming, for argument's sake, that the prosecutor's comment was improper, we hold the trial court cured any error committed with its prompt instruction to disregard. Generally, any harm from an improper state-

ment in a jury argument is remedied when the court instructs the jury to disregard, unless the remark is so inflammatory that the prejudicial effect cannot be removed by an admonishment. *Johnson v. State,* 698 S.W.2d 154, 167 (Tex.Crim.App.1985), *cert. denied,* 479 U.S. 870, 107 S.Ct. 239, 93 L.Ed.2d 164 (1986).

Peoples does not argue that the prosecutor's remark itself was so inflammatory that an instruction to disregard could not remove its prejudicial effect. Instead, he merely contends jurors would not disregard the remark because of the prosecutor's "vaulted position." Because the trial court's instruction cured any error committed, we overrule Peoples' first point of error.

In point two, Peoples complains of the following testimony given by West's mother during the punishment phase of trial:

THE WITNESS: I heard the two shots and my husband say: What's that? I said: I don't know. And I heard Nitri scream and then I heard Dexter holler: Man. The next thing I knew I had leaped out of bed and I ran outside. And when I saw him—

Q [PROSECUTOR]. When you say "him"—

A. Man. When I saw him, I just screamed and I ran to him. She had already said he had been shot. And I thought maybe a drive-by shooting or something. And he was bleeding real furious from the mouth.

[DEFENSE COUNSEL]: Ever so respectful, Judge, I object to testifying in the narrative.

THE COURT: Sustained.

Q [PROSECUTOR]. And what did you do when you saw your son bleeding?

A. When I ran out there to him he was on one knee and holding his chest. So I said: Man, where you shot? He said: My chest. And that's when I screamed for my husband to come out and help me.

Q. And did your husband come out?

A. My husband ran out and he was trying to talk to him and everything. So we went to get him in the house, and he kind of limped, so my husband—

Q. Excuse me. If you need to take some time, feel free. Did you get your son in the house?

A. Yes. We got him in the house. And my husband was asking where was the ambulance, because Nitri had called. And by that time, the police got there, Forest Hill police, and they was saying: Where's the ambulance? Where's he shot?

Q. And while the police were on there [sic] way, what was going on with Edward?

A. He was just lying there and he was bleeding. And I was talking to him, telling him to hang in there, it was going to be all right.

Q. What position was Edward in?

A. He was lying on his back. And I had his head on my lap and I was trying to wipe some of the blood from his mouth and his nose so he would be able to breath [sic].

Q. And—

A. And so I kept holding his hand and telling him it was going to be all right. Just hang in there.

Q. Well, what happened once the police and the ambulance arrived?

A. When the ambulance got there, they asked me where had he been shot. And I said: I don't know, he told me his chest. So they asked me to hold his head, keep his head up while they cut his shirt off. And when they removed his shirt I could see the one bullet wound at the top of his shoulder.

While they was turning him over, I kept saying: Man, it's going to be all right, just hang in there. So they turned him back over, and when they turned him back he was struggling like he wanted to get up. And I was just saying: Man, just lie there, be still, it's going to be okay. I said: I told you, I promise you, the Lord's not going to let anything happen to you. I said: He have his hand around you, it's going to be all right.

Q. And what happened next?

A. After they turned him over he was struggling like he was trying to get up, and they was trying to hold him down. He

kicked for a few minutes and he went limp. I told him, I said: I can't feel his pulse. And I kept calling—

At this point defense counsel objected to the testimony as irrelevant because Peoples had already been found guilty of murder. Defense counsel contended the testimony had nothing to do with Peoples' moral guilt and that its probative value was substantially outweighed by the dangers listed in TEX. R.CRIM.EVID. 403. The trial court overruled the objections, but the prosecutor moved to another line of questioning.

■ Peoples contends the trial court's admission of this evidence was improper. We note, however, that defense counsel's objection was untimely; it was made after the testimony was already before the jury. Thus, unless admission of the testimony was fundamental error, Peoples has waived this point. *See* TEX.R.APP.P. 52(a); TEX.R.CRIM. EVID. 103(a)(1), (d).

Peoples acknowledges courts have recently broadened the scope of permissible evidence at punishment to include information related to the emotional impact of the murder on the victim's family. He also concedes that all evidence relating to the moral culpability of a particular murder defendant should be taken into account in determining the proper punishment. He then argues, somewhat inconsistently, that permissible evidence does not include testimony about the anguished thoughts and feelings of a mother as her son died in her arms.

■ The Court of Criminal Appeals has held that subject to the limitations imposed by TEX.CODE CRIM.PROC.ANN. art. 37.07, § 3(a) (Vernon Supp.1994), evidence of the circumstances of the offense are admissible at the punishment phase of trial. *Miller–El v. State,* 782 S.W.2d 892, 896 (Tex.Crim.App. 1990). Victim impact evidence is a circumstance of the offense, so long as that evidence has some bearing on the defendant's personal responsibility and moral guilt. *Stavinoha v. State,* 808 S.W.2d 76, 78–79 (Tex.Crim.App. 1991). The *Stavinoha* court ruled that evidence of psychological damage to a victim and his mother that the defendant could easily have anticipated has a bearing on the defendant's personal responsibility and his moral guilt. *Id.* at 79. Consequently, this type of evidence is admissible at punishment. *Id.*

We believe Peoples could easily have anticipated the anguish of West's mother as she watched her son die. Thus, under *Stavinoha,* this evidence has a bearing on Peoples' personal responsibility and moral guilt and was properly admitted at the punishment phase of his trial.

Peoples also argues this type of evidence improperly shifts the focus of the punishment decision from the defendant to the deceased's character. He urges admission of victim impact evidence will lead to harsher sentences for those persons who kill individuals who are of "good character" or are important to the community.

The United States Supreme Court addressed these arguments in *Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). In that case, the Court stated victim impact evidence is designed to show *each* victim's uniqueness as an individual human being, whatever the jury may think the loss to the community resulting from his death might be. *Payne v. Tennessee,* 501 U.S. at ——, 111 S.Ct. at 2607, 115 L.Ed.2d at 734 (emphasis in original). The State has a legitimate interest in countering the defendant's mitigating evidence by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and to his family, in particular. 501 U.S. at ——, 111 S.Ct. at 2608, 115 L.Ed.2d at 735.

We overrule point of error two.

In point three, Peoples complains the trial court improperly failed to grant a mistrial after the prosecutor brought forward testimony about an unnamed extraneous bad act.

During the guilt/innocence phase of trial, Nitri Brown, a key State witness, testified:

Q [PROSECUTOR]. Okay. You don't like being here today, do you?

A. No.

Q. You didn't want to be in front of the Grand Jury either, did you?

A. No.

Q. What did you think about being at the police station?

A. I didn't want to be there.

Q. And why don't you want to be here today?

[DEFENSE COUNSEL]: I'll object to the relevance of that particular question, Judge.

[PROSECUTOR]: He's put her, as far as credibility, into issue and there are reasons.

THE COURT: What purpose are you offering this?

[PROSECUTOR]: To dispute the impeachment evidence that he's placed on this witness.

[DEFENSE COUNSEL]: I'll object. That's not relevant.

THE COURT: All right. For rebuttal purposes, and for that limited purpose, your objection is overruled.

THE WITNESS: What was the question?

Q [PROSECUTOR]. Why don't you want to be here today?

A. Scared.

Q. Of what?

A. For myself.

Q. Why?

A. Because of what I've heard.

Q. Okay.

[DEFENSE COUNSEL]: Your Honor, I object to that. I'm going to object to what she said. I'll object to that, that's not relevant.

THE COURT: Sustained.

[DEFENSE COUNSEL]: And ask it be stricken from the record.

THE COURT: Sustained. Do you want it stricken from the record?

[DEFENSE COUNSEL]: No, ma'am. I'd ask the jury be instructed to disregard.

THE COURT: The jury's so instructed to disregard the last statement. It was nonresponsive to the question.

[DEFENSE COUNSEL]: Move for mistrial.

THE COURT: Denied.

Peoples contends Brown's testimony that she was afraid "[b]ecause of what I've heard" can have no interpretation other than that she had been threatened or otherwise placed in fear by someone. Peoples further contends the testimony reflected on him and indicated he was engaged in threatening witnesses. He asserts evidence of this extraneous bad act was inadmissible because the State failed to show that: (1) the testimony was relevant to the offense charged and had materiality beyond the defendant's character; *and* (2) its relevancy outweighed its potentially damaging or inflammatory effect. *See Boutwell v. State*, 719 S.W.2d 164, 170 (Tex. Crim.App.1985). The State argues that it did not have to satisfy the *Boutwell* test because defense counsel objected only to the relevance of this evidence.

When a party objects to evidence on relevance grounds, the objection preserves a complaint that the evidence is inadmissible under TEX.R.CRIM.EVID. 404(b). *Montgomery v. State*, 810 S.W.2d 372, 387 (Tex.Crim. App.1990) (opinion on reh'g). When this complaint is lodged, the proponent of the evidence must satisfy the trial court that the "other crime, wrong, or act" has relevance apart from its tendency "to prove the character of a person in order to show that he acted in conformity therewith." *Id.;* Rule 404(b). Once the trial judge rules on the relevance of the evidence apart from character conformity, she has ruled on the full extent of the opponent's objection. *Montgomery*, 810 S.W.2d at 388.

If the proffered evidence has relevance outside of character conformity, the opposing party must further object under TEX.R.CRIM.EVID. 403 that the probative value of the evidence is outweighed by its prejudicial effect. *Montgomery*, 810 S.W.2d at 388. The opponent's failure to raise a Rule 403 objection waives the second prong of the old *Boutwell* test. *Montgomery*, 810 S.W.2d at 388–89.

In this instance, Peoples objected at trial only on grounds that the evidence was not relevant. Thus, the trial court was only called upon to determine whether the evidence was relevant apart from its tendency to prove character conformity. *Id.* at 387–88; Rule 404(b). The court was never asked to rule on the probative value of the evidence balanced against its harmful potential. Accordingly, Peoples cannot complain on appeal of the court's refusal to declare a mistrial on this basis. TEX.R.APP.P. 52(a).

Moreover, in Texas, evidence that a witness has been threatened or that someone has attempted to coerce her testimony is admissible to show the accused's "consciousness of guilt." *See Brown v. State*, 657 S.W.2d 117, 119 (Tex.Crim.App. [Panel Op.] 1983) (threats against witness's family); *Rodriguez v. State*, 577 S.W.2d 491, 493 (Tex. Crim.App. [Panel Op.] 1979) (threats against State's witness). Threats or other attempts at coercion are "hardly the actions of an innocent accused," and evidence of such is every bit as probative of guilt as would be flight by the accused. *Id.*

The Rule 404(b) list of purposes for which extraneous offense evidence may be admissible is not exhaustive. *Banda v. State*, 768 S.W.2d 294, 296 (Tex.Crim.App.), *cert. denied*, 493 U.S. 923, 110 S.Ct. 291, 107 L.Ed.2d 270 (1989). The "consciousness of guilt" exception to the general prohibition against extraneous offense evidence "is alive and well in Texas." *Torres v. State*, 794 S.W.2d 596, 599 (Tex.App.—Austin 1990, no pet.). Evidence of Peoples'[1] attempt to intimidate or silence Nitri Brown was therefore relevant under Rule 404(b). We withhold judgment on the propriety of the court's action in excluding the contested evidence, however, because the prosecutor offered it for impeachment purposes and not to prove Peoples threatened Brown. *See Montgomery*, 810 S.W.2d at 387.

Because Peoples did not preserve error on this point and because evidence of an accused's threats to witnesses is generally admissible, we overrule point of error three.

In his remaining point, Peoples contends his conviction is invalid because of prosecutorial misconduct. During the guilt/innocence phase of trial, Peoples testified about the intimate nature of his relationship with his girlfriend, Nitri Brown. He testified that he loved Brown and that she had once been pregnant by him.

During the punishment phase, Peoples produced several character witnesses, including his pastor, Reverend Ralph Waldo Emerson, Jr. Emerson testified that Peoples was quiet and withdrawn, polite and well liked. Emerson also testified that Peoples had a reputation for being a peaceful and law-abiding citizen.

During cross-examination, the prosecutor asked Emerson:

Q. What's the Baptist—or your church's theory on whether or not to terminate a pregnancy?

A. Well—

[DEFENSE COUNSEL]: Excuse me. Judge, I would object to the relevance of that question.

THE COURT: Do you want to respond?

[PROSECUTOR]: I'll withdraw the question, Your Honor.

THE COURT: All right. Are you passing?

---

1. To the extent Brown's testimony may suggest that she was threatened without Peoples' knowledge, her testimony is not extraneous offense evidence and is not barred by Rule 404(b). *See Salazar v. State*, 805 S.W.2d 538, 541 (Tex.App.—Fort Worth 1991, pet. ref'd).

[PROSECUTOR]: I'm sorry. I pass the witness. No more questions.

■ Peoples asserts this question is nothing short of despicable and completely outside the record. He contends it served no useful purpose, since abortion was not even indirectly connected with any issue before the court or jury. Peoples' characterization of the question may be correct, but he failed to get a ruling on his objection. Consequently, nothing is presented for our review. TEX. R.APP.P. 52(a).

While we do not condone the prosecutor's conduct, reversal for improper questions alone is "rare," such as when the question is so stated that it amounts to an assertion of fact and implies the commission of another offense. *Swallow v. State*, 829 S.W.2d 223, 227 (Tex.Crim.App.1992). Even in those instances, the efficacy of curative instructions must be determined on a case-by-case basis. *Id.* In this case, the question did not imply the commission of another offense. In addition, the prosecutor withdrew the question and apologized for asking it. This is not one of those rare instances that an instruction to disregard could not have cured.

We overrule Peoples' fourth point of error.

The trial court's judgment is affirmed.