

# COURT OF APPEALS

**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

**NO. 2-06-316-CR**
**NO. 2-06-317-CR**
**NO. 2-06-318-CR**

TERRY LEE HORNBUCKLE                                 APPELLANT
A/K/A TERRY HORNBUCKLE

V.

THE STATE OF TEXAS                                           STATE

------------

FROM THE 372ND DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

A jury convicted Appellant Terry Lee Hornbuckle of sexual assault of three women, with each offense alleged in a separate indictment. The jury assessed Appellant's punishment at fifteen years', fourteen years', and ten years' confinement respectively in the Institutional Division of the Texas Department

---

[1] *See* TEX. R. APP. P. 47.4.

of Criminal Justice and additionally assessed a fine of $10,000 in each case. The trial court sentenced Appellant accordingly and ordered the time to be served concurrently but the fines to be paid individually.

On appeal, Appellant challenges both the legal and factual sufficiency of the evidence in each case. Additionally, Appellant challenges the admission of evidence concerning extraneous offenses and bad acts. Because we hold that the evidence is both legally and factually sufficient and that the trial court did not reversibly err, we affirm the trial court's judgments.

## I. BACKGROUND FACTS

Appellant appeals his convictions on charges of sexual assault of three women: K.B., Jane Doe (a pseudonym), and Kate Jones (a pseudonym).

Appellant was the bishop at Agape Christian Fellowship Church in Arlington, Texas. At trial, K.B. testified that she had attended Agape Christian Fellowship Church for about seven years; Appellant was her bishop during that time, and she considered him to be her spiritual advisor. She testified that on Saturday, July 31, 2004, Appellant called her on her cell phone, and during the conversation, he stated that he wanted to give her something for her birthday. He asked her to meet him at a Wendy's restaurant so that he could "put a blessing and a seed in [her] hand," which she took to mean a compact disc (CD); congregation members would sometimes be given tapes or CDs of

2

excerpts from his preaching. He also told her that he wanted to give her a check; K.B. testified that she had known him to give money to other people in the church.

At Wendy's, Appellant told her to get into his car because he needed to go get his checkbook. She rode with him to an apartment complex. Once there, he invited her inside and gave her a beverage, which he said was Kool-Aid. According to K.B., the drink was bitter. He told her to "make herself at home" and "look around" while he looked for the man who he claimed owned the apartment and had his checkbook. K.B. testified that after a time, she began getting sleepy. At some point, she took a picture with the camera on her cell phone. She testified that she sat on a couch, and then the next thing she can remember from that point is hearing a phone ring and feeling "like a person was getting off of [her]." She saw Appellant, who was naked, go into the bathroom. At that point, she too was naked. She stood up and began getting dressed, feeling dizzy. Appellant came out of the bathroom, told her that "he wasn't done," and put her on the bed. She testified that "he used his hand . . . to guide his penis in," and that "it felt like when you try to put a tampon in and it hurts to go up." The following Monday, K.B. went to a hospital, where she tested positive for benzodiazepine.

Doe testified that she had attended Agape Christian Fellowship Church

3

for about three years, beginning in 1999. She considered Appellant to be her bishop. A few weeks after she started attending the church, her boyfriend ended their relationship, and she contacted Appellant "looking for some type of guidance." Appellant came to her apartment with a bottle of wine. Doe drank some wine that he poured for her. After a while, she began to experience "a numb feeling, a relaxed, just kind of careless feeling." Appellant began massaging her back; Doe testified that as he was massaging her back, she "felt the part of the back of [her] pants being moved down." She remembered nothing from that time until she woke up later; Appellant was gone at that point. When she woke up, she was still clothed.

Doe testified that through attending the church, she became spiritually and emotionally dependent on Appellant. Eventually, they developed a sexual relationship; Doe testified that she initially told him, "No," but gave in because "it seemed easier." She testified that she got out of the relationship by moving, changing her phone number, and "basically just disappearing from everybody."

Jones testified that in the summer of 2004, Appellant approached her while she was at her health club. They talked and exchanged phone numbers. A few days later, Appellant called Jones and asked if he could come to her home. When he arrived at her home, he brought a black bag with him that contained drug paraphernalia. Appellant and Jones smoked methamphetamine

4

that he had brought.  Jones told Appellant about problems that she had had with men in the past; she testified that he told her that "God brought him into [her] life to teach [her] how to trust in a man."

Sometime in late summer, Appellant came to her home again, and they again used drugs.  Appellant went into the kitchen and got some water for Jones, which she drank.  After she drank the water, she started "coming down very fast" from the high she had had from the drugs.  She began losing track of the conversation, and she felt her body getting weak and tired until she blacked out.  She remembered coming to in her bed.  Neither she nor Appellant was dressed.  Jones got up, and as she did so, she observed what appeared to be semen coming out of her vagina.  She testified that she did not consent  to sex with Appellant.

## II.  LEGAL AND FACTUAL SUFFICIENCY OF THE EVIDENCE

## A.  K.B.

In his first point, Appellant argues that the evidence is both legally and factually insufficient to sustain a conviction for the sexual assault of K.B. because the evidence is insufficient as to penetration and penile penetration. The indictment charged in the first paragraph of the sole live count that Appellant intentionally or knowingly caused the penetration of K.B.'s female sexual organ by inserting his penis into her female sexual organ without her

5

consent and that he knew she was unable to consent because she was unconscious or physically unable to resist. In the second paragraph, the indictment charged Appellant with penile penetration of K.B.'s female sexual organ without her consent and further alleged that he had intentionally impaired her power to appraise or control her conduct by administering a substance without her knowledge.

At trial, K.B. did not testify specifically that Appellant had penetrated her because she said she was a virgin and had no idea what penetration felt like. She did, however, testify that it felt like "when you try to put a tampon in and it hurts to go up." When a frustrated prosecutor asked, "Did this man steal your virginity?" K.B. replied, "I honestly don't know what happened that night, but he raped me, and I don't know the extent of it, but something was done to me that had not been done to me before." When asked directly if Appellant penetrated her, she replied, "All I can say is the feeling was like that tampon. That's all I can say, because it's just—it's like you're trying to put something in that it can't go up. There's no hole for it to go into and it just hurts." The prosecutor questioned, "His penis contacted your vaginal area, correct?" K.B. replied, "Yes." The prosecutor asked, "And that was painful?" K.B. answered, "I felt pain."

Appellant argues that this evidence is insufficient to prove both

6

penetration and penile penetration. There is, however, further testimony regarding this matter. K.B. testified, "I remember him sliding my panties down and trying—he used his hand to turn the light on and the other hand to guide his penis in." Trying to clarify, the prosecutor asked, "And he used his hand to guide his penis inside you?" K.B. replied, "Yes." Then, when the prosecutor asked if Appellant had penetrated her, she replied merely, "It hurt." It was when asked what it felt like that she described it as feeling like trying to put a tampon in. Consequently, there is evidence from K.B. that Appellant used his hand to guide his penis inside her, it hurt, it felt like trying to put a tampon in, and "and it hurt to go up."

The State was required to prove only penetration of the labia.[2] Further, we can take judicial knowledge of the meaning of the word *tampon* and its normal use.[3] Applying the appropriate standards of review,[4] we hold the evidence both legally and factually sufficient to support Appellant's conviction

---

[2] *See Vernon v. State*, 841 S.W.2d 407, 409 (Tex. Crim. App. 1992).

[3] *See* TEX. R. EVID. 201.

[4] *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) (both providing legal sufficiency standard of review); *Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006); *Drichas v. State*, 175 S.W.3d 795, 799 (Tex. Crim. App. 2005); *Sims v. State*, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003); *Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000) (all providing factual sufficiency standard of review).

for the sexual assault of K.B. and overrule Appellant's first point.

## B. JANE DOE

In his second point, Appellant argues that the evidence is both legally and factually insufficient to sustain his conviction for the sexual assault of Jane Doe on the issue of clergyman-induced consent. Section 22.011(b)(10) of the penal code provides that sexual intercourse is without consent if "the actor is a clergyman who causes the other person to submit or participate by exploiting the other person's emotional dependency on the clergyman in the clergyman's professional character as spiritual advisor."[5] Appellant does not challenge the constitutionality of this provision.

Jane Doe began a sexual relationship with Appellant when she called him after a very emotional breakup with her boyfriend. She had attended Appellant's church and considered him her bishop, although she did not become an official member. In her testimony, Doe described her emotional state at the time she called Appellant after the breakup with her boyfriend: "I was looking for some type of guidance, someone to talk to. I was very devastated. I was very emotional and I was just looking, at that point in time, for someone to talk to and to help me and to guide me through this time in my life." That same

---

[5] TEX. PENAL CODE ANN. § 22.011(b)(10) (Vernon Supp. 2007).

8

night, she invited Appellant into her home, and he arrived with a bottle of wine and a little black notebook. They began to discuss the problem with the boyfriend, and she testified, "I was very emotional at that point in time. I was absolutely devastated that the love of my life had just walked out on me." She drank wine with Appellant, and he massaged her shoulders. When she woke up, clothed, Appellant was gone.

Weeks later, Appellant wanted to meet with Doe at her home to speak to her about her personal problems. She testified that she was feeling that he had taken advantage of her weakness. At this second visit, he counseled with her about deeper issues. She testified that she told him her deepest, darkest secrets and that she believed that he preyed on her because of her weaknesses. She testified that she believed that he knew when he saw her in church that she could be the one that he could "do this to." She testified that Appellant would say he could love her and that "he knew the void of my life was my mother and he knew that the only time that my mother would tell me that she loved me was when she was drinking, and I told him all of this information."

Doe testified that as he told her he could love her, he would comfort her and get closer to her. They ended up having sex. She testified that she told him, "No," but that he would continue and she would eventually give in. When asked why she would give in, she testified, "It honestly seemed easier. I was

9

scared. I was afraid. And my body, it was so weak at the time with . . . everything I was going through, it seemed . . . easier . . . just to let it happen than just to scream and fight and run to the police." There were approximately four or five meetings between Appellant and Doe at her house. All of the meetings basically happened the same way: Appellant would come over to comfort her.

Appellant argues that although Doe initially looked at him as a spiritual advisor, later it was clear that they were meeting for a sexual relationship and not for spiritual counseling. Doe insisted that she was afraid of him and that she never made a distinction between Appellant the man and Appellant the bishop. She testified that she always looked at him as her bishop.

Appellant also argues that section 22.011(b)(10) in no way forbids a man who happens to be a preacher and a spiritual advisor from having an affair with a woman who happens to be a member of his church. He argues that the law requires both the exploration of the complainant's emotional dependency on the actor while in his professional role as a spiritual advisor and also the actor's purposeful exploitation of that emotional dependency. The Texas statute is somewhat broader than Appellant's interpretation. The statute requires only that the actor be a clergyman who causes the other person to submit or participate in the sexual activity while the clergyman is acting as a spiritual

10

advisor.[6] Doe testified that Appellant was her bishop and that he caused her to submit to his sexual advances by exploiting her emotional dependence on him as her spiritual advisor.

We are not in a position to judge the credibility of Doe's testimony.[7] That is the function of the jury.[8] Thus, applying the appropriate standards of review,[9] we hold that the evidence is both legally and factually sufficient to support Appellant's conviction for the sexual assault of Jane Doe and overrule his second point.

### C. KATE JONES

In his third point, Appellant challenges the legal and factual sufficiency of the evidence supporting his conviction for the sexual assault of Kate Jones. The indictment charged that Appellant caused the penetration of Jones's female

---

[6] *See id.*

[7] *See Johnson*, 23 S.W.3d at 12; *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999), *cert. denied*, 529 U.S. 1131 (2000); *Cain v. State*, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).

[8] *See* TEX. CODE CRIM. PROC. ANN. art. 38.04 (Vernon 1979); *Margraves v. State*, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000); *Johnson*, 23 S.W.3d at 8.

[9] *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Clayton*, 235 S.W.3d at 778 (both providing legal sufficiency standard); *Watson*, 204 S.W.3d at 414; *Drichas*, 175 S.W.3d at 799; *Sims*, 99 S.W.3d at 603; *Johnson*, 23 S.W.3d at 11 (all four providing factual sufficiency standard).

sexual organ by inserting his penis into it without her consent and that Appellant knew Jones was unable to consent because she was unconscious and physically unable to resist. Alternatively, the indictment alleged penetration without Jones's consent because Appellant knew that she was unaware that the sexual assault was occurring or, alternatively, that penetration was without her consent because Appellant had intentionally impaired her power to appraise or control her conduct by administering a substance without her knowledge.

When different theories of the offense are submitted to the jury in the disjunctive, as in the case now before this court, a general verdict is sufficient if the evidence supports any one of the alternative theories.[10] Additionally, the case now before this court is a circumstantial evidence case, but the standard of review is the same in both direct and circumstantial evidence cases.[11]

Unlike K.B. and Doe, Jones was not a member of the church and did not know Appellant as a bishop. Instead, she met him at the health club where they both worked out. She invited him to her home, and they smoked methamphetamine together. She testified that she told him that she had trust issues with men and that he had told her that God had brought him into her life

---

[10] *Herrin v. State*, 125 S.W.3d 436, 441 (Tex. Crim. App. 2002).

[11] *Burden v. State*, 55 S.W.3d 608, 612–13 (Tex. Crim. App. 2001).

12

to teach her how to trust in a man and to show her that Appellant was going to be a friend to her. Nothing of a physical or sexual nature happened during the first visit. She also testified that Appellant told her not to tell anyone that she knew him and that when she asked why, he replied, "Because the press would eat me alive." She told him, "You're just a counselor for the Cowboys, for the rookies, why would that matter?" He replied, "Trust me, they will."

The second time Appellant came to Jones's home, the evidence shows that

- Jones and Appellant were dressed and using methamphetamine in her living room,

- Appellant took her water bottle off the table and apparently filled it up from her water cooler in the kitchen, because she heard it bubble,

- the water cooler could not be seen from the living room,

- Appellant told Jones that because of the drugs and her earlier workout, she was going to get too dehydrated and really needed to drink the water, and "[h]e was a little insistent about it,"

- about fifteen to twenty minutes after she drank the water, although she had been very high on methamphetamine, her body started coming down extremely fast.

She also testified that she was losing track of conversation, of what

13

Appellant was saying, and of what was going on. Her body was getting weak, tired, and very, very heavy, to the point where she could not move. She testified that she blacked out. Jones described her blackout as the type "where [she] knew what [she] was doing at one moment and then there's a time frame [she had] no idea what occurred, and then all of a sudden [she] knew what [was] going on again."

She also testified that this feeling was different than she had felt when coming down from a high off drugs and like nothing she had experienced before: "For as up as I was to come that down and black out, it was very powerful." She testified that she believes that he slipped a drug into her water without her knowledge. The last thing she remembers happening in the living room was "[h]im asking [her] if she was still with him [and] to stay awake." She was unable to respond. The next thing she remembered was coming to, naked, in her bed; she did not know how she ended up in the bedroom. Appellant was also naked in her bedroom, and she asked him what was going on. He told her that everything was okay, that she had wanted a massage, that she could trust him, and that he was her friend. She testified that she told him that something was wrong and asked him to leave. When Jones stood up, she felt and observed what she described as his semen or ejaculation coming from her vagina. Based on her "[w]aking up without [her] clothes on" and "that

14

coming out of [her]," she then "knew what he had done," even though she could not state for a fact that his penis had entered her vagina because she did not remember; "[she] was blacked out."

Jones testified that she did not give Appellant permission to have sexual intercourse with her on that date and that she was not aware that sexual intercourse had occurred until she saw his naked body, her naked body, and the semen coming from her vagina. Before he left, Appellant gave Jones a hundred dollars. Jones left him a message telling him not to contact her again. Jones did not report these events until after she learned Appellant's true identity and that he had been arrested for sexual assault.

The only evidence of sexual assault, Appellant argues, is Jones's testimony that she got out of bed and "felt semen coming out of her body." Appellant argues that there was no medical testimony or lab testing that reflected what the substance that she said came out of her could have been. Apparently, Appellant is arguing that expert testimony is necessary to prove that Jones felt semen coming from her vagina. While it is clear that some things are such common knowledge that they do not require expert testimony, we understand Appellant's argument to be that distinguishing between semen and other substances is not part of such common knowledge. Consequently, a person would be competent to testify that vomit came from her mouth, that

15

she experienced diarrhea, or that she was bleeding because all males and females normally have this common experience. But, Appellant apparently posits, a woman could not competently testify that the substance coming from her vagina and running down her legs was semen.

Jones was a woman not inexperienced in sexual intercourse. She had been involved in a sexual relationship with at least one man, had a daughter, and also had been married. In response to the question, "The — substance and the consistency and the, I guess, how it came out of your body, were you familiar with that feeling?", she answered, "Yes, ma'am," and also testified that that feeling indicated to her that Appellant had had sex with her. Specifically, she indicated that the substance coming out of her body indicated that he had ejaculated inside of her female sexual organ.

Appellant has not directed us to any portion of the record in which he objected that she was incompetent to testify that the substance coming from her vagina was semen, but he did try to establish on cross-examination that it could have been a different substance.

As Abraham Lincoln is reputed to have made clear, evidence of something coming out may be sufficient evidence that something went in. A witness may not see someone bite off the ear of an opponent during a fight, but the witness's observation of the person spitting the ear out supports the

conclusion that the person did indeed bite the ear off.[12]  Similarly, in this case, the testimony that, after a period of being unaware of what was going on, Jones found herself with Appellant in the bedroom undressed, and when she stood up, felt semen come from her vagina and run down her legs is evidence of penetration and ejaculation.  We may take judicial notice that ejaculate, or semen, comes from a penis.[13]  The only penis in the room was Appellant's.

Applying the appropriate standards of review,[14] we hold that the evidence is both legally and factually sufficient to support the jury's verdict that Appellant sexually assaulted Kate Jones, and we overrule Appellant's third point.

### III. EXTRANEOUS OFFENSES AND ACTS OF MISCONDUCT

In his final three points, Appellant argues that the trial court erred by admitting evidence of extraneous offenses and acts of misconduct.

---

[12] *See* Gertrude Block, *Punctuated Lawyer*, 43 FED. L. 7, 7 (1996).

[13] See TEX. R. EVID. 201(b), (c).

[14] *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Clayton*, 235 S.W.3d at 778 (both providing legal sufficiency standard); *Watson*, 204 S.W.3d at 414; *Drichas*, 175 S.W.3d at 799; *Sims*, 99 S.W.3d at 603; *Johnson*, 23 S.W.3d at 11 (all four providing factual sufficiency standard).

## A. LISA FULLER

Appellant argues in his fourth point that the testimony from Lisa Fuller is inadmissible under rules 403 and 404 because it is irrelevant, highly prejudicial, inflammatory, and had no probative value.  Rule 404(b) of the Texas Rules of Evidence provides in pertinent part:

> Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, or accident.[15]

Rule 403 provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence."[16]

Fuller testified that Appellant directed her to lie to the grand jury and attempted to intimidate her as a witness.  He tried to get her to reveal her grand jury testimony and to portray him favorably to a defense investigator.  This court has held that when a witness has been threatened or someone has attempted to coerce that witness's testimony, evidence concerning those

---

[15] ▣ TEX. R. EVID. 404(b).

[16] ▣ TEX. R. EVID. 403.

actions is admissible to show the accused's "consciousness of guilt."[17] Additionally, as the State points out, the Texas Court of Criminal Appeals has stated the standard for admitting consciousness-of-guilt evidence that involves an obstruction of justice:

> criminal acts that are designed to reduce the likelihood of prosecution, conviction, or incarceration for the offense on trial are admissible under Rule 404(b) as showing "consciousness of guilt." These include threats against . . . witnesses and their families.[18]

We therefore hold that the evidence was admissible under rule 404(b).

Similarly, based on our review of the record, we hold that the trial court could have properly concluded after a rule 403 balancing test that the probative value of Fuller's testimony was not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence.[19] We therefore hold that the trial court did not abuse its discretion by admitting Fuller's testimony. We overrule Appellant's fourth point.

---

[17] *Peoples v. State*, 874 S.W.2d 804, 809 (Tex. App.—Fort Worth 1994, pet. ref'd).

[18] *Ransom v. State*, 920 S.W.2d 288, 299 (Tex. Crim. App. 1994) (op. on reh'g) (citations omitted), *cert. denied,* 519 U.S. 1030 (1996).

[19] *See* TEX. R. EVID. 403.

19

## B. LISA MIKALS

In his fifth point, Appellant argues that the trial court erred by admitting extraneous evidence and bad acts testimony from Lisa Mikals concerning their consensual sexual affair.

Mikals was a married member and employee of the church. She and Appellant had engaged in a sexual relationship for two years. She rented an apartment to facilitate their ongoing sexual meetings.

Over objection, she was allowed to testify that during this relationship with Appellant, she felt he had degraded her, yelled at her, and stalked her, and he threatened her when she testified before the grand jury, causing her to perjure herself.

Mikals testified that Appellant confronted her prior to her grand jury testimony and told her to represent him in a good light—as a pastor, husband, and father. He also instructed her to call other grand jury witnesses to find out what questions they had been asked. He told her to keep their sexual relationship secret and not to mention the apartment.

Mikals also testified that he told her he had dogs on the street and connections, and if she did not do what he told her to do, her character would not stand up against his. She claimed that that was the reason she lied to the grand jury. She testified that he also became angry and abusive when she

20

refused to talk with his investigator and instead hired an attorney.

As we discussed above, a defendant's attempts to tamper with a witness are admissible under rule 404(b) as evidence of consciousness of guilt.[20] Based on our review of the record, we also conclude that the trial court could have properly found that the probative value of Mikals's testimony was not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence.[21] We therefore hold under the limited facts of this case that the trial court did not abuse its discretion by admitting Mikals's testimony. We overrule Appellant's fifth point.

### C. ALISA LEWIS AND MARY GRESSETT

In his sixth point, Appellant argues that the trial court erred by admitting extraneous bad acts testimony from Alisa Lewis and Mary Gressett concerning attempted sexual conduct. Appellant voiced rule 404(b) and 403 objections to their testimony.

Lewis testified that five years before trial, Appellant had come to her home to counsel her and to help her create a budget. While he was at her

---

[20] *Ransom*, 920 S.W.2d at 299.

[21] *See* TEX. R. EVID. 403.

21

home, he tried to kiss her. She told him to leave, and he did.

While this conduct is in some ways similar to the conduct described by the three complainants, it happened several years before and only tenuously fits into the 404(b) exceptions.[22] We therefore hold that the trial court abused its discretion by admitting it. Because the evidence was minimally inflammatory, considering the gravity of the three charged offenses in comparison, we hold that the error was harmless.[23]

Gressett, on the other hand, testified that Appellant made a pass at her four years before trial. He had come to her home with wine to help her financially and give her guidance while her husband was away in a drug rehabilitation center. Appellant gave her a back rub and, when his hands went down the back of her skirt on to her bare skin, she confronted him and asked him to leave.

This testimony was sufficiently similar to the testimony of the complainants to be admissible under rule 404(b).[24] The defense vigorously challenged the testimony of the complainants who testified to similar actions by Appellant. This vigorous defense opened the door to testimony of similar

---

[22] See TEX. R. EVID. 404(b).

[23] *See* TEX. R. APP. P. 44.2(b).

[24] See TEX. R. EVID. 404(b).

22

conduct as part of the State's rehabilitation of the challenged witnesses. Specifically, as the State points out, evidence that Appellant had subjected Gressett to the same scenario he used on K.B., and offered to provide her with counseling and support, is admissible to rebut Appellant's suggestions that K.B. had set Appellant up and was lying.[25]  Again, based on our review of the record, we cannot say that the probative value of Gressett's testimony was substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence.[26]  The trial court therefore did not abuse its discretion by admitting Gressett's testimony.  We overrule Appellant's sixth point.

## IV. CONCLUSION

Having overruled all of Appellant's points, we affirm the trial court's judgments.

LEE ANN DAUPHINOT
JUSTICE

PANEL A:  CAYCE, C.J.; DAUPHINOT and MCCOY, JJ.

DO NOT PUBLISH

---

[25] *See Wheeler v. State*, 67 S.W.3d 879, 885–89 (Tex. Crim. App. 2002); *Casey v. State*, 215 S.W.3d 870, 879 (Tex. Crim. App. 2007).

[26] *See* TEX. R. EVID. 403.

23

TEX. R. APP. P. 47.2(b)

DELIVERED: May 22, 2008